Bbeitel, J.
Defendant, Christopher Lynch, appeals from a judgment of the Appellate Division, Second Department, unanimously affirming, without opinion, a judgment of conviction for the crime of murder in the first degree, after a jury trial in Supreme Court. Defendant was sentenced to life imprisonment.
Defendant assigns as reversible error that the trial court incorrectly charged on the issue of intoxication; refused to recall the jury after its verdict and discharge because of the publication of a prejudicial newspaper article during the trial, and refused to allow discovery of a statement made by a prosecution accomplice witness to his lawyer. Defendant also argues that it was error to refuse defendant’s pretrial request for the names and statements of all witnesses; that an improper lineup and showup violated due process; that pretrial newspaper publicity prevented a fair trial and a motion for change of venue was improperly denied, and that the verdict is against the weight of the evidence.
*266 It is concluded that the defendant’s claims are of insufficient merit, and that the judgment below should be affirmed.
Defendant, 17-years old, was charged with the fatal knifing on March 12, 1965 of one Andrew Mormile, also 17, on an IND subway train. The principal evidence against him was given by Terry Toomer, a friend and accomplice of the defendant. Toomer was given immunity before he testified.
Toomer testified that he and the defendant had been together from time to time on March 12, 1965, and continuously from 8:00 p.m. through the events involved in the killing. They, during these times, had drunk various alcoholic beverages. Sometime after 10:00 p.m., on their way from Brooklyn to Manhattan by subway, they entered a middle car of an IND subway train. They accosted three teen-age girls who were moving through the train, and followed them into the first car. In that car the deceased sat in a corner looking out the window. Alongside him was another youth. While Toomer spoke to one of the three girls, defendant entered the first car and stood over deceased. When deceased started to rise, the defendant grabbed him by the collar. The defendant then pulled a knife from his trousers and stabbed deceased three or four times about the head. When the stabbing started the three girls began screaming and ran from the car. The train pulled into the Franklin Avenue Station, and Toomer and defendant left the train. The defendant dropped the knife between the platform and the car as he left.
Toomer admitted, under cross-examination, that during his interrogation one police officer had threatened him with a beating unless he talked about the stabbing. He denied however that any police officer threatened to hold him responsible for the murder if he did not speak. The police told him they would help him if he told the truth, and that he would get consideration “ if [he] had nothing to do with it ”.
Toomer’s evidence on the crucial issue of the identity of the killer was corroborated by other passengers in the subway car. The three girls confirmed that they had been walking towards the front of the train, and had met the defendant and Toomer. Eleanor Daniels heard Toomer ask deceased for cigarettes and money. After her court identificatibn of defendant, she testified that she had seen the defendant kick the deceased and strike *267 him both with his fist and with a knife. She described the assailant as a “ tall boy ” (defendant is 6 feet, 4 inches and weighs 200 lbs.), and said she had seen the assailant’s face at this time. Janice Rapelyea testified that Toomer took money and cigarettes handed to him by deceased. A “ real tall ” youth then entered the car. The tall youth asked deceased for something, then took out his knife and started stabbing him. Deceased fell to the floor and Toomer started to kick him. Miss Rapelyea admitted that she had not seen the assailant’s face, and could only identify him by his size and clothing. The third girl, Camelia Hurd, testified that Toomer tried to get some money from deceased. When the tall youth with Toomer asked for money, too, deceased said that he had given all he had to Toomer. The tall youth then struck deceased; Toomer joined him, picking up their victim and throwing him against a pole in the car. She did not see a knife.
Another occupant of the first car was Frank Magon. He testified that three fellows entered the car, two short ones followed a minute filter by a tall one. The first two were already pushing deceased before the third entered. The tall one had a knife and proceeded to stab deceased. Magon identified defendant as the one who had done the stabbing.
The prosecution also produced a subway employee who had found a red-stained knife on the tracks of the Franklin Avenue Station. The stain on the knife was human blood. Toomer identified it as one he had seen in the defendant’s possession on an earlier occasion, and as.the one which defendant had used the night of-the killing. The knife was then received in evidence. Two other witnesses, Serkanic and Sharko, who had been present in the second car of the train, testified that they had seen defendant in the subway that evening.
The defendant testified in his own defense. He and Toomer had been drinking heavily that day. He described in detail their activities before they started out on their subway trip. On a train they met a friend of Toomer, whose identity is never disclosed, and who accompanied them throughout the rest of the trip. On the IND train to which they had transferred they accosted the girls and followed them into the first car. In that car the third youth, Toomer’s friend, started a fight with deceased. The deceased knocked his assailant to the floor. *268 Toomer ran over and started pushing deceased. Defendant then pushed deceased, but neither punched, kicked, nor stabbed him. Toomer and the third youth were still punching deceased when the defendant left the train at the Franklin Avenue Station. He saw no stabbing. Deceased was never on the floor while defendant was in the train. As he walked up the steps of the station he was joined by Toomer and Toomer’s friend.
Defendant contends that the charge to the jury dealing with intoxication improperly shifted the burden of proof. He also argues that the charge required that the intoxication be so great as to destroy all volition, and that the defense would not be made out even if the jury found intoxication had negatived the specific intent for first degree murder. The charge, although certainly imperfect as to clarity and consistency, when read in its entirety, belies these assertions. The court repeatedly charged the jury that the prosecution must prove guilt beyond a reasonable doubt not only as to the killing but also as to premeditation, deliberation, and intent. Defendant isolates phrases in the charge which, taken alone, might appear superficially to shift the burden on the issue of intoxication, or require stronger proof of intoxication than does the law. The pertinent part of the charge reads as follows:
“ Gentlemen, in view of the fact that there has been some testimony about intoxication, whether that testimony was strong or weak on the issue of intoxication is not important, but it becomes necessary for me as the Judge to charge you on the law of intoxication, the moment that the issue is put into the trial, no matter in what form it comes out, as I said, whether it he weak testimony or strong testimony; the law mandates me to tell you about the law of intoxication.
“ And so I charge you on intoxication. And must warn you, as I have before, this does not mean that I have any opinion for your guidance that the defendant was or was not intoxicated. The law simply requires that when an issue of intoxication is raised during the trial of a case, the Court must tell the jury what the law is as to that issue, because the Judge does not know what view the jurors will take as to that particular factual issue, weak or strong, or how the jury will view it.
‘ ‘ So, gentlemen, I must tell you that voluntary intoxication is never a defense to crime. A person can’t go out .and get *269 himself drunk and then come out and stab and kill somebody and say, ‘ Well, I should be excused because I was drunk. ’ That would be a silly kind of a law, wouldn’t it?
“ But the law does say that if the crime with which the person is charged is a crime which requires intent, thought, purpose, design of mind, and there isn’t that design of the mind and there can’t be the formation of that purpose or intent because of the intoxicated condition of the person, then you cannot find that person guilty of that degree of the crime which requires the formation of that intent.
“ And so I must tell you about intoxication, because I have charged you on the various forms of crime. I have instructed you and defined for you the various forms of murder and homicide, and I have told you about murder in the first degree, requiring premeditation and deliberation and design and intent.
“ And so the law says that if a person’s mind is so inflamed by intoxicants that he could not form a design or he didn’t have the mentality with which to form an intent to commit a crime, then the law says that he cannot be found guilty of a crime which requires the existence of intent.
“ So, gentlemen, it is for you to determine, from all of the circumstances in this case and from all of the testimony in this case to which you listened, that there is a basis for a finding that this man was so intoxicated, to such a great extent, as to deprive him of the power or the mentality of forming an intent or to have a purpose or a design to act; more specifically, to do the acts with which he is charged in this case.
“ Gentlemen, here again you must take the law on intoxication and intertwine it with the facts to which you listened, and if you are convinced that the testimony in the case indicated to you that this man was so drunk and was so overwhelmed by intoxication that he could not form an intent to commit a crime, then this is an important issue on the question of intent. But again I say, it is for you to say, from what you heard; from the testimony of the girls; from the testimony of Serkanic, or from the testimony of Sharko.
“Was he so drunk? Gentlemen, this is your department.”
A few pages later in the record the court charged: “ The next one is that the burden of proof in this case rests with the prosecution from beginning to end of the trial .to estab *270 lish beyond a reasonable doubt every fact essential to the conviction of a defendant. The defendant has no burden to sustain. It is enough that his evidence when taken by the prosecution [sic] raises a reasonable doubt as to his guilt, in which case he must be acquitted. I so charge. I have indicated that in my principal charge.”
Taken in its entirety, and placed in the context of the total charge, with the repeated instructions on reasonable doubt and burden of proof as to all elements of the crime, the portion on intoxication neither shifted the burden of proof nor required a state of intoxication greater than that needed to negate the elements of first degree murder. Moreover, defendant’s requests to charge are not appreciably different from the charge actually given.
Defendant also argues that it was error for the trial court to refuse to recall the jury after it had rendered its verdict, to determine whether its members had been influenced by a newspaper article. The article appeared on page six of the New York Herald-Tribune, a now defunct metropolitan newspaper, while the trial was in progress, but was not discovered by defense counsel until after the verdict had been rendered. Defendant, before judgment, moved for a new trial under subdivision 2 of section 465 of the Code of Criminal Procedure on the ground that the jury had received evidence out of court. The article reported that defendant had contemplated pleading guilty to second degree murder but had elected to risk a jury verdict and the maximum life sentence, after failing to enlist the co-operation of the District Attorney to obtain a lighter sentence. Such a news account, if read, might well have been prejudicial, as it might have been construed as an admission of guilt by defendant and defendant’s counsel (cf. People v. Tassiello, 300 N. Y. 425, 428-430). But defendant has not asserted that the jurors had read the article or had formed an opinion as a result of reading it. He requested that the jurors be recalled merely because such an article had been published, and could have been seen by them. Even if the jurors had read the article, there would be no basis for a mistrial or other drastic action. It would still be necessary to show that a juror had formed an opinion, and that such an opinion would influence his verdict (People v. Genovese, 10 N Y 2d 478, 481-482). Merely the *271 single publication of the article in the Herald-Tribune hardly established the likelihood that it was read by any of the jury or that any were unduly influenced by it. Moreover, defendant offers no reason why he has not attempted to show that the jurors were exposed to the article or read it, nor has he demonstrated that the former jurors were unavailable to him. Whatever the effect of a refusal to examine jurors if the question had been raised before their deliberation or discharge, it was not, on this showing, error for the trial court to refuse post-verdict interrogation of jurors after their discharge (cf. Mares v. United States, 383 F. 2d 805; 5 Wharton’s Criminal Law and Procedure, § 2124, esp. 1968 Cum. Supp., p. 141, n. 6.2).
Defendant contends that it was error to deny him discovery of a statement made by Toomer to his lawyer prior to trial. Defendant relies on People v. Rosario (9 N Y 2d 286) for the proposition that such a communication is discoverable. That case applied to statements taken by law enforcement officials, and, moreover, exempted from discovery material “ that must be kept confidential ” (at p. 289). Defendant argues, however, that the privilege was waived when Toomer accepted immunity and testified. This would be true if the witness had testified to the content of a prior conversation with his lawyer, thus waiving his right to keep the conversation confidential. But, testimony about an event, even when the witness is protected by immunity, should not be construed as a waiver of the privilege, merely because the subject matter of the testimony may also have been discussed in the privileged communication. The situation should not be confused with the waiver of the privilege against self incrimination by partial disclosure. Defendant’s argument, if sustained, would undermine the attorney-client privilege, which should be preserved, especially with respect to a client who occupies the status of a criminal accomplice. Perhaps as valuable as the privilege against self incrimination is the freedom of confidential communication between lawyer and client.
Defendant’s request for the names and statements of all witnesses to the crime was denied as a matter of discretion, except as to Toomer, whom, notably, the defense was allowed to interview. There appears to be some disagreement as to whether pretrial release to a criminal defendant of names or statements *272 of potential witnesses is permissible (compare People v. Powell, 49 Misc 2d 624, with People v. Mami, 214 N. Y. S. 2d 788 [Queens County Ct.]). But if, indeed, such discovery may be had in the trial court’s discretion, the refusal of discovery in this case was not an abuse of that discretion. Moreover, defendant has failed to show any harm resulting from the denial of disclosure. He alleges merely that pretrial discovery would have indicated that the prosecution’s “ eyewitnesses ” had not seen the face of the defendant, or that the defense might have interviewed two passengers who had sat in the second subway car but who did not testify. This is argued despite the earlier contention of defendant that the use by the prosecution of other passengers in the second car as witnesses ‘ ‘ added nothing to the prosecution’s case * * * and was used merely for its harmful cumulative effect.”
There was no reversible error in the pretrial denial of a change in venue by the Appellate Division. While the newspaper articles, if read, and believed, might unduly influence a juror (cf. People v. Genovese, 10 N Y 2d 478, 481-482, supra), there is no showing that that occurred. Although defendant demonstrates through reference to the voir dire examination of prospective jurors that many of them had read the articles and might have formed opinions which could preclude an open mind, none who indicated exposure to the newspaper account was selected for service on the jury. There was, therefore, no prejudice (see People v. Hulett, 28 A D 2d 624, affd. 22 N Y 2d 696). Moreover, there was no error committed by the Trial Judge when he refused to excuse the entire panel because of defendant’s assertion that those who had not read the articles would be prejudiced by hearing of others who had.
Defendant also argues that a lineup and showup used by the police were a denial of due process. The lineup was conducted for five passengers, only two of whom, Sharko and Serkanic, were- witnesses at the trial. It included defendant and five policemen of defendant’s approximate height and weight. ‘ ‘ Most ’ ’ of the policemen were between 35 and 40 years of age, as contrasted to defendant, who was 17 years old. The “ showup ”, conducted for the witness Magon alone, consisted of an officer showing the defendant to Magon and saying, perhaps with a questioning intonation, “ That’s the man you saw *273 on the train Although no issue was raised at the trial, and the record lacks evidence on the effect of the prior identifications, both the lineup and the showup, if material, might well have constituted deprivations of due process* (see People v. Ballott, 20 N Y 2d 600, 605-607). But, as will be seen, there was no prejudice to defendant.
The witness Sharko identified defendant as one present on the subway train, a fact otherwise proved and testified to by defendant, but did not observe any of the criminal acts. The witness Serkanic, like the witness Sharko, also identified the defendant as present in the second subway car but witnessed nothing of what happened in the first car when the fatal knifing occurred.- No issue is raised by defendant as to the direct and indirect identification by the girl witnesses, Misses Rapelyea, Daniels, and Hurd. Magon, of course, is a critical witness, particularly important in the corroboration of the accomplice witness, Toomer. As to him, too, the highly questionable showup is also quite immaterial.
In view of the limited character of the testimony of those who had viewed the earlier lineup, the error was not prejudicial (Code Grim. Pro., § 542; cf. People v. Brown, 20 N Y 2d 238, 243, 244). Those trial witnesses who viewed the lineup (Serkanic and Sharko) testified only as to defendant’s passage through the train. As previously noted, defendant has characterized their testimony as “ adding nothing to the prosecution’s case ”, albeit he overstates the matter. Moreover, as to Magon, defendant himself testified at length to his presence in the train and in the car where the killing occurred. In view of this testimony, Magon’s identification of defendant in the courtroom, and his exposure to the questionable showup, also lose their importance. If the defendant’s presence in the subway car with two others is accepted, the only remaining issue is which of the three youths was responsible for the knifing. Magon and, most important, the three girls were able to distinguish the knife wielder from his companions because of his unusual size. Thus the testimony of the witnesses all but conclusively identifies the defendant as the “ tall one ”, and, therefore, as the assailant, *274 even without in-court identification and without dependence on the Magon direct court identification or the questionable showup that preceded it.
Turning to the sufficiency of the evidence, the testimony of the girls and of Magon, when combined with that of Toomer, provides evidence upon which a jury might find the defendant guilty beyond a reasonable doubt. Various inconsistencies in their testimony as to events other than the stabbing are not sufficient to nullify their agreement on the identity of the assailant and the fact of the fatal assault.
A final comment is required on the evidence of intoxication, and thus on the requisite intent. The defendant’s testimony as to intoxication, even if uncontradicted, need not have been accepted by the jury (cf. People v. Koerber, 244 N. Y. 147, 155). Moreover, defendant’s remarks right after the stabbing, as related by Toomer, that ‘ ‘ the guy tried to ignore him standing over him and that he lost * * * he snapped for a couple of minutes and killed him ’ ’, need not have been regarded by the jury as evidence of exculpatory or mitigating intoxication. True, Toomer testified that after the stabbing, as distinguished from the preceding events, the defendant “ had no control over himself.” Nevertheless, the jury was entitled to rely on the testimony of other passengers that defendant appeared normal. They were also entitled to find from defendant’s own narration, given in considerable detail, of the events both preceding and following the critical confrontation, that his intoxication was not so great as to negative existence of the requisite intent (cf. People v. Koerber, supra, p. 155).
For all the reasons discussed there was no reversible error upon the trial itself. Such irregularities as occurred with respect to the showup for the witness Magon, and perhaps as to the lineup for the other witnesses, in the context of the whole case and the undisputed presence of the defendant in thé subway car at or about the time of the killing, did not result in prejudice to the defendant.
Accordingly, the judgment of the Appellate Division should be affirmed.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Keating and Jasen concur. .
Judgment affirmed.

 Defendant’s lack of counsel at the lineup is not urged as grounds for reversal since United States v. Wade (388 U. S. 218) is given only prospective effect (Stovall v. Denno, 388 U. S. 293, 296) and hence does not apply.