**Kate Rothko PRIZEL, as Administratrix c.t.a. of the Estate of Mark Rothko, Deceased, Plaintiff,**

v.

**KARELSEN, KARELSEN, LAWRENCE & NATHAN, et al., Defendants.**

No. 76 Civ. 2144–CLB.

United States District Court,
S. D. New York.

March 18, 1977.

---

Breed, Abbott, & Morgan by James D. Zirin and James Patterson, New York City, for plaintiff.

Kaye, Scholer, Fierman, Hays & Handler by Aaron Rubinstein and Sidney Kwestel, New York City, for defendant Karelson.

Solinger & Gordon by Stanley L. Kay, New York City, for defendant Saidenberg.

Sullivan & Cromwell by David W. Peck and David M. Olasov, New York City, for non-party Witness Marlborough Gallery, Inc.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

By motion filed February 24, 1977, heard March 1 and fully submitted March 9, 1977, plaintiff seeks an order pursuant to Rules 30 and 37, F.R.Civ.P., directing witness Richard L. Plaut to answer questions at his continued deposition, with respect to which an attorney-client privilege has been asserted in behalf of his employers, Marlborough Gallery, Inc. and Marlborough, A.G. The deposition began February 2, 1977, and including colloquy, has already run 144 pages of transcript, and consumed most of a working day.

Neither Plaut nor Marlborough Gallery, Inc., a New York corporation of which he was "Administrator", nor its affiliate, Marlborough, A.G., a Leichtenstein corporation, are parties to this litigation. Both corporations, collectively referred to as "Marlborough" are said to be controlled by one Francis K. Lloyd, also a non-party. It is undisputed that the inquiries relate to conversations had by Plaut in the course of his employment, with members of law firms who were attorneys for Marlborough. At issue is Marlborough's privilege, not that of Plaut.

In the amended complaint here in this diversity case, plaintiff, as a successor per-

sonal representative of Mark Rothko, deceased, a noted artist, seeks relief against a law firm (hereinafter "Karelsen") and an art gallery, Saidenberg Gallery, Inc., acting at all relevant times as an appraiser of works of art, and its principal, Daniel Saidenberg. Plaut's communications, which are the subject of this motion, were not had with the Karelsen firm.

It is alleged, and assumed, for purposes of this motion, to be true, that one Reis, one of the Rothko executors since removed as such by the Surrogate of New York County, who was also an officer and director of Marlborough, conspired with Lloyd and others to defraud the Rothko Estate by arranging for the executors to sell Rothko paintings in bulk to Marlborough for less than their true value, to do so secretly and by unlawful and fraudulent means, and that the Karelsen firm acted tortiously in effecting the fraudulent sale, and that Saidenberg acted tortiously as an appraiser to "enable the sale to be made."

In a proceeding in the Surrogate's Court of New York County, to which the defendants here were not parties, a decree was filed on January 16, 1976 which revoked letters testamentary issued to the executors named in the Will, removed them from office, and granted judgments in favor of a successor representative, plaintiff here, against the executors, Marlborough and Lloyd. See *Matter of Rothko,* 84 Misc.2d 830, 379 N.Y.S.2d 923 (N.Y.Sur.1975). State appellate review of this decree is presently pending.

By pre-trial discovery, plaintiff seeks to obtain evidence tending to prove an alleged substantial discrepancy between the price at which the Rothko paintings were sold by the executors to Marlborough, and the prices at which Marlborough valued the paintings for resale. What is sought to be established is the values which Marlborough itself, by its internal records, gave to the paintings bought from the executors. Apparently, proceedings before the Surrogate showed that it was the practice of Marlborough to maintain a stock book for its inventory of paintings held for sale, which would set forth a firm selling price for each item, below which, except for favored customers such as museums, a painting would not be sold.

Movant contends here, and we assume for purposes of this motion, that it can be shown that while litigation was pending in the Surrogate's Court, the stock book slips for Rothko paintings were removed from the stock book, and replaced with new slips which omitted any reference to selling price. Many of the slips were unavailable at the hearing before the Surrogate, and it was represented to the Surrogate that the stock book had been disassembled and lost "in the course of transmission between the various attorneys."

Part of the testimony of Plaut in the Surrogate's proceeding has been quoted in the motion papers. In substance he testified in that trial that he had caused new slips to be prepared for the stock book and had removed the old slips after xeroxing the old stock book. In the deposition in this case, Plaut testified to a different version of his alteration of the stock book, and that he had, at Lloyd's instructions, repossessed a xerox copy of the stock book from counsel to Marlborough. Plaut now admits that his prior testimony at the Surrogate's Court proceeding was false in part. See p. 46, *et seq.* of Plaut deposition in this action. It is not unreasonable to assume that he knew at the time that it was false, and knew that he was engaged in wrongdoing, whether perjury, fabrication of or tampering with physical evidence, or however described. In this context Plaut testified (p. 39, *et seq.*):

Q Will you state as best you can and as fully as you can the first conversation you had with Mr. Lloyd?

A To the best of my recollection, Mr. Lloyd said to me that some of the selling prices for Rothko paintings were too high and that they should be removed from the stock book.

That's the first conversation.

Q Is that in your office or his office?

A His office.

Q He sent for you and told you this?

A I believe that to be the case. I'm not too clear on that.

Q Can you fix the date of this conversation?

A No.

\* \* \* \* \* \*

Q Did you know at that time that the stock book with the stock slips in them had been covered by a notice to produce?

\* \* \* \* \* \*

A Let me put my answer this way. I knew that a Xerox of the stock book had been produced and sent to counsel for Marlborough.

\* \* \* \* \* \*

Q When Mr. Lloyd made this statement to you to which you have just testified, did you make a response?

A To the best of my recollection, I responded and indicated that a Xerox of the stock book had already been sent to [counsel].

Q With the existing information in it, of course?

A That's correct.

Q What did Mr. Lloyd say to that?

A He said—he told me to get that Xerox back from [counsel].

Q Did you get it back from [counsel]?

A Yes, I did.

\* \* \* \* \* \*

Q Did [counsel] return the Xerox copy to you?

A Yes.

Q When you received it, what did you do with it?

A To the best of my recollection, I put it in the registrar's office.

Q Do you know where it now is?

A I believe it is still in the registrar's office.

Q When did you last see it there?

A I don't recall.

Q Tell me about your second conversation with Mr. Lloyd, did that take place in your office?

A Yes, it did.

Q It was two days after the first conversation?

MR. VELIE: He testified it was within two days.

A Within two days.

Q Will you state the substance of that conversation as fully as you can?

A At that time I was drawing a line through the selling price and writing in underneath, 'Ask DMK.'

MR. GORDON: What?

THE WITNESS: And writing underneath, 'Ask DMK.'

A To the best of my recollection, Mr. Lloyd looked over my shoulder and saw what I was doing and said that that would not be appropriate.

I then indicated to him that if that was the case, the only way to remove the selling prices would be to retype all the pertinent slips.

Q What did Mr. Lloyd say?

A I don't recall exactly what he said to my explanation. It seems to me that he assented to my explanation, but I don't recall the exact words.

Q Did Mr. Lloyd say why he wanted the selling price removed?

A Except for telling me that they were too high, no.

It is clear that after having decided to embark upon whatever wrongdoing he may have committed in his employer's behalf, Plaut had conversations relating to the events with several attorneys, each of whom had an attorney-client relation with Marlborough.

■ Movant wishes to penetrate this discussion, contending that the attorney-client privilege may not be asserted "to conceal advice given in connection with the commission of a crime, or the perpetration of a fraud, even where the attorney may not have been a participant." (Affidavit of Edward J. Ross, Esq., para. 42).

It would be inviting to dispose of this motion by characterizing it for what it is, pre-trial discovery overkill. Plaintiff has now established, after 144 pages of testimony from Plaut, that a xerox copy of the

original stock record book represented in the hearings before the Surrogate to have been "lost" is still in existence, in the possession of Marlborough, and amenable to subpoena; she has also established that Plaut testified falsely in the Surrogate's proceedings, very likely at the behest of Lloyd.

These particular defendants sued here do not appear to have participated in any misconduct with respect to Marlborough's stock book on the part of Plaut, Marlborough or Lloyd. Indeed, a valuation placed upon the paintings by Marlborough, Lloyd or Plaut is probably not binding on these defendants, and of very slight evidentiary value. Assuming, *arguendo,* that in this action plaintiff can spell out some sort of agency, or vicarious liability of these defendants for acts of co-conspirators, during the course of the conspiracy and in furtherance of its purposes, such agency principles, if available here, ceased to apply when the conspiracy was discovered. The conspiracy pleaded here was known to plaintiff prior to the trial in the Surrogate's Court, and prior to Plaut's alteration of the stock book. Evil conduct of Lloyd, Plaut or Marlborough, shown to have occurred after discovery of the alleged conspiracy, will not be regarded as acts of these defendants here sued. Accordingly, the necessity in this case to penetrate the conversations between Plaut and any of Marlborough's various attorneys is non-existent. Nothing Plaut could have said to the attorneys, or they to him, will assist in the trial of this case against these defendants.

Furthermore, there is no sufficient factual basis to call forth the limitation on attorney-client privilege found in *dicta* in *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) (Cardozo, J.):

> "There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told. There are early cases apparently to the effect that a mere charge of illegality, not supported by any evidence, will set the confidences free. See, e. g., *Reynell v. Sprye,* 10 Beav. 51, 54, 11 Beav. 618; *In re Postlewaite,* 35 Ch.D. 722, 724; *cf. Regina v. Bollivant* (1900) 2 Q.B.D. 163 (1901) A.C. 196. But this conception of the privilege is without support in later rulings. 'It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud.' *O'Rourke v. Darbishire,* (1920) A.C. 581, 604. To drive the privilege away, there must be 'something to give colour to the charge'; there must be '*prima facie* evidence that it has some foundation in fact.' *O'Rourke v. Darbishire, loc. cit., supra;* also pp. 614, 622, 631, 633. When that evidence is supplied, the seal of secrecy is broken. See also: *Regina v. Cox,* (1884) 14 Q.B.D. 153, 157, 161, 175; *cf. Bujac v. Wilson,* 27 N.Mex. 112; 196 P. 513; *In re Niday,* 15 Idaho 559; 98 P. 845."

In this case, there is nothing shown to give colour to the charge of abuse of the privileged relationship.

■ The attorney-client privilege protects the need for free, uninhibited exchange of information with an attorney. That need is recognized by the public policy of New York, embodied in statute. See N.Y. CPLR § 4503(a).

■ We should guard the honor of our profession against unjustified or unnecessary intrusions into communications with lawyers clearly privileged. The exception to the privilege found in Disciplinary Rule 4–101(C)(3), which permits a lawyer to reveal "the intention of his client to commit a crime and the information necessary to prevent the crime," should be limited to its plain meaning. Any confidential communication with an attorney made *after* the commission of the crime or fraud, is, and should be, protected by privilege. That privilege is of a high order. "Perhaps as valuable as the privilege against self incrimination is the freedom of confidential communication between lawyer and client." [Breitel, J. in *People v. Lynch,* 23 N.Y.2d

262, 271, 296 N.Y.S.2d 327, 334, 244 N.E.2d 29, 35 (1968)]. When Plaut spoke to the attorneys for Marlborough he had already entered on his alteration of the stock book.

The motion is denied. The action is referred to Hon. Sol Schreiber, United States Magistrate, for all pre-trial purposes.

So Ordered.