THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ROBERT FARRUGGIA, Appellant.

Fourth Department, December 12, 1980

448

APPEARANCES OF COUNSEL

*James L. Kemp* for appellant.

*Lawrence T. Kurlander, District Attorney (David Pogue* of counsel), for respondent.

**OPINION OF THE COURT**

DILLON, P. J.

The jury found defendant guilty of grand larceny in the first degree (Penal Law, § 155.40). He was accused of stealing money and property belonging to one John Hucknall by instilling in Hucknall a fear that defendant or another person would cause physical injury to Hucknall.

Hucknall was a principal prosecution witness at trial. On direct examination he fully narrated events constituting defendant's criminal conduct. On cross-examination, however, he repeatedly invoked his right against self incrimination and refused to answer a number of questions. Hucknall gave no self incriminating testimony in response to the direct examination, nor did he at any time waive his right against self incrimination. No part of Hucknall's testimony was struck by the trial court and the chief issue on appeal is whether Hucknall's exercise of his Fifth Amendment rights violated defendant's right to "be confronted with the witnesses against him" (US Const, 6th Amdt; NY Const, art I, § 6).

The relevant facts may be drawn from Hucknall's testimony. He stated that he owned three businesses; a nightclub, an insurance agency, and a furniture and appliance store, all in the Village of Brockport. In January, or February, 1979 he asked one of his employees, Donald Lang, to help him obtain a loan of $150,000. Hucknall, through Lang's efforts, was placed in contact with the defendant.

On February 1, 1979 Hucknall had a phone conversation with defendant in which he was told that defendant could take care of everything; that Hucknall should meet with defendant on the next day at defendant's combination apartment and grocery store; and that Hucknall should bring with him $2,000 in cash to help place the loan. Hucknall, accompanied by Lang, went to defendant's apartment on February 2, 1979, and in the course of their meeting defendant said that somebody wanted to hurt Hucknall, that there was a "contract" on his life and that someone was going to "snuff" Hucknall. At defendant's request Hucknall gave defendant $2,000 to find out more information on the contract.

On the following evening defendant went to Hucknall's nightclub and there told Hucknall that there was an open "contract" for $10,000 on Hucknall, that there were five people defendant had to reach and that it would cost $15,000 to cancel the contract. Defendant told Hucknall that Hucknall would need all the money he could lay his hands on and thereupon Hucknall gave defendant $1,700, taken from the nightclub cash registers "to stop whatever was going on".

On the next day defendant told Hucknall that he was disappointed that more cash had not been raised. Hucknall then arranged with defendant to give defendant some furniture, and defendant stated that he would finalize the payment to the five individuals and that Hucknall could pay defendant back later. Thereafter the furniture was delivered and defendant said that he would contact Hucknall in a few days to make sure that Hucknall was in the clear. During these conversations Hucknall spoke with defendant about the $150,000 loan but defendant said that the contract had to be paid off first. Hucknall testified that no loan was ever obtained.

Hucknall also testified that the Rochester Police Department contacted him in March, 1979. He agreed to co-operate with them, and the police sent him to meet with defendant. At this meeting defendant told Hucknall that he had paid $19,000, not $15,000, to pay off the people who were "after" Hucknall. Hucknall asked defendant for proof that the contract was real and defendant said he would give such proof

at some later date. Defendant also told Hucknall that he was unable to negotiate the $150,000 loan but would try to get it, or would return the $15,000.

Hucknall identified several of his furniture store receipts which were made out to defendant, in a total amount of $9,000. He further testified that the wholesale value of the merchandise listed on the receipts was $7,800 and the normal retail value thereof would be $14,800. The $9,000 figure represented the discounted value of the furniture. Hucknall also said that defendant never returned the furniture nor paid for any of it, nor did defendant return any of the money Hucknall had given him. He testified that defendant had offered to return the $15,000, and he added that he had never refused to accept such payment.

On cross-examination Hucknall declined to answer questions as to whether he had sought financial aid or secured loans from banks, insurance companies, Westinghouse Credit Corporation or private investors. He also refused to answer questions dealing with his business relations with insurance companies and whether insurance companies had demanded from him moneys which were owed to them. He refused to answer questions concerning names of particular creditors. He also refused to answer a series of questions as to whether he had diverted insurance company funds to his own use. The following is illustrative: "Q. Did you deposit at least twenty-three separate checks amounting to $133,400. which have been given to you by people to whom you had sold insurance and which money was actually owned by insurance companies to your [nightclub] account?"

Defense counsel's purpose in asking such questions was premised upon a defense theory of which the court was made aware before Hucknall took the witness stand. At that time, Hucknall's personal attorney, the prosecutor and defense counsel argued before the court as to whether, if Hucknall testified, defense counsel would be allowed to cross-examine him concerning Hucknall's reasons for requiring the loan. Defense counsel argued as follows:

"This is the theory of this defense. This man was about to get arrested. This man knew he was in trouble. Now he was

about to get arrested because—they were onto him as far as these criminal acts. The insurance companies where he diverted the money from was [sic] about ready to have him arrested. This came around in January when all this was discovered about the diversion of funds. Now, in order to take the heat off himself Mr. Hucknall turned this story around, went to the police with Roberts [Lang's stage name]. He wanted to be the one that was now assisting the police in the arrest of Bob Farruggia upon an extortion charge. Now he's part of a complainant situation. Now he is not going to be arrested anymore and all the criminal activity which had been brought to this point is what triggered this case. If I can't show that, if I can't frame my defense to show that, I lose the whole impact of the defense in my case. Hucknall concocted this story to get the heat off himself. It worked with Roberts [Lang] and the police. They worked together and turned it around. They aren't the bad guys anymore. Here is the bad guy * * *

"We are offering this argument to the Court and not the jury to show the integral connection of this man's financial condition with out [sic] defense. Our defense is that this is pure poppy-cock that he was threatened, that his financial condition was so bad that he hired somebody paying them allegedly $15,000. to go find him some money—just help me."

█ While it is true, as argued by the People, that defendant never moved to strike all or part of Hucknall's direct testimony, the issue, affecting as it does a substantial right of the defendant, nonetheless is preserved for review. Defendant's position with respect to his perceived need for extensive cross-examination of Hucknall was fully made known to the court (CPL 470.05, subd 2) and it may not be said on this record that by his failure to have moved to strike, he intended to waive the issue (cf. *People v Le Mieux,* 51 NY2d 981).

The confrontation clause includes and guarantees the right of cross-examination *(Douglas v Alabama,* 380 US 415; *Mattox v United States,* 156 US 237). The right traditionally has been a hallmark of New York jurisprudence and is recognized as fundamental to a fair trial *(People v*

*Becker,* 210 NY 274, 304-305). It has been described as the "greatest legal engine ever invented for the discovery of truth" (5 Wigmore, Evidence [Chadbourn Rev], § 1367; *California v Green,* 399 US 149, 158). "In short, the Clause envisions 'a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' *(Mattox v. United States,* 156 U.S., at 242-243". *(Ohio v Roberts,* 448 US 56, —, 100 S Ct 2531, 2537-2538.)

A witness, of course, has the right to invoke his constitutional protection against self incrimination *(Alford v United States,* 282 US 687, 694). Curtailment of cross-examination, occasioned by a witness' invocation of the Fifth Amendment, does not offend the confrontation clause if the unanswered questions are completely collateral to the direct evidence *(Fountain v United States,* 384 F2d 624, 628). Even though prior criminal acts or prior criminal records are proper subjects of cross-examination for purposes of impeaching credibility, a witness' refusal to answer does not violate the defendant's right of confrontation if the questions relate solely to the credibility of the witness and not at all to the subject matter of the witness' direct examination *(United States v Cardillo,* 316 F2d 606, cert den 375 US 822).

When the restriction upon cross-examination goes beyond the exclusion of purely collateral matters, however, the testimony of the witness must be stricken in whole or in part *(United States v Cardillo, supra).* There can be no restriction upon cross-examination which "can deprive a defendant of an important means of combating inculpatory testimony or at least demonstrating the existence of a reasonable doubt as to guilt *(Davis v Alaska,* 415 US 308, 315-317; *Douglas v Alabama,* 380 US 415, 418; cf. *Greene v McElroy,* 360 US 474, 496-497)." *(People v Gissendanner,* 48 NY2d 543, 548.)

Here the defendant made it clear to the court that his

purpose on cross-examination was to show that Hucknall was in such dire financial circumstances that he was willing to pay defendant a $15,000 finder's fee for defendant's procurement of a loan to Hucknall of $150,000, and that Hucknall had concocted the extortion scheme in order to avoid criminal prosecution for his own larcenous conduct. The line of inquiry which defense counsel sought to pursue obviously had a purpose other than mere impeachment of Hucknall's credibility. Its purpose went further, i.e., to show that there was no extortion at all, and to show Hucknall's motivation to fabricate his direct testimony.

It is not for us to speculate whether the jury would have accepted defendant's reasoning if counsel has been permitted a full opportunity to present it. There is no doubt, however, "that the jurors were entitled to have the benefit of the defense theory before them" (Davis v Alaska, 415 US 308, 317). Only then could they have made an informed judgment as to the reliability of Hucknall's claim that defendant had extorted money and property from him. By asserting his Fifth Amendment privilege and refusing to answer relevant questions, Hucknall deprived defendant of his right to a comprehensive cross-examination. Hucknall's direct testimony was thus before the jury with minimal impeachment or contradiction from other evidence. In the circumstances we see here, it was essential to defendant's right to a fair trial that Hucknall's direct testimony be struck (Davis v Alaska, supra; Alford v United States, 282 US 687, 692).

Two other issues require brief comment. Defendant did not testify in his own defense. He argues that the court erred in ruling that a 1971 conviction for grand larceny in the second degree, based upon a 1969 arrest, could be used to impeach the defendant if he chose to testify. The court carefully considered the relevant factors: remoteness in time, whether the prior conviction bore logically on credibility, and the similarity of the prior act with the crime charged. Having applied the correct rules, there is no basis for finding that the trial court abused its discretion (People v Rahman, 46 NY2d 882).

Lastly, although not requiring reversal, the prosecutor

should not have stated in his summation that "Mr. Hucknall's criminal past, what it is, what it might be, what it has been, is certainly something that he may answer to". This comment, while no doubt prompted by defense counsel's comments on summation, was not within the four corners of the evidence *(People v Ashwal*, 39 NY2d 105, 109; *Williams v Brooklyn El. R. R. Co.*, 126 NY 96, 103).

The judgment of conviction should be reversed and the defendant should be granted a new trial.

CARDAMONE, SIMONS, DOERR and WITMER, JJ., concur.

Judgment unanimously reversed and a new trial granted.