OPINION OF THE COURT
Colleen McMahon, J.[1]
In this rare prosecution under New York’s enterprise corruption, or "Little RICO” statute a key cooperating witness has asserted attorney-client privilege to avoid answering questions that are highly relevant to establishing his motive to falsify his testimony. For the reasons stated below, I hold that the defendants’ Sixth Amendment right of confrontation would be impaired if the witness were permitted to invoke the privilege, and I order him to answer questions about his awareness of the penalties he faced if he did not sign a cooperation agreement and testify favorably for the People.
BACKGROUND
This is the second trial under indictment No. 1430/93, which charges eight former officers and employees of Oxford Capital *468 Securities, Inc. with enterprise corruption (Penal Law § 460.20), scheme to defraud (Penal Law § 190.65), grand larceny (by false promise) (Penal Law § 155.35), and violations of the Martin Act (General Business Law § 352-c). The three defendants who are currently on trial are described in the indictment as being on the third or lowest tier of the Oxford operation; accordingly, their trial was severed from that of more senior executives. The first- and second-tier defendants were tried last year before another Judge. All were convicted of multiple felonies, including enterprise corruption.
A key witness at both trials was Leonard Donner, another former Oxford employee, who had previously pleaded guilty to a Martin Act violation (a class E felony) and two misdemeanor tax counts.[2] As a result of his plea, Donner faces a maximum sentence of V-U to 4 years.
Donnér’s situation would have been far more parlous had he not won the race to the District Attorney’s office. He has confessed to stealing $4.8 million from his former clients, in many instances inducing elderly people and close personal friends to deplete their hard-earned (and modest) life’s savings by misleading them about the nature of the "investment” they were making. He was also close to the seat of power at Oxford. He worked in the same room as the firm’s founder and criminal mastermind, Samuel Forson, and his closest associates, where he helped run the Ponzi scheme that Oxford allegedly became. If the three third-tier defendants were convicted of all the counts they face (and, at this moment, they are presumed innocent of every accusation), they would be guilty of but a fraction of Donner’s admitted misdeeds.
At the trial, codefendants’ defense counsel attempted to question Donner about his awareness of the penalties he would have faced had he been indicted, tried and convicted of his many crimes. Had Donner admitted that he knew he was looking at a possible sentence of 8[1]/s to 25 years, the defendants would have argued that Donner had a powerful motive to invent a story that implicated them.
If Donner knew about the serious punishment he faced, it was most likely because his attorney had explained his options as part of his evaluation of whether to accept the People’s plea *469 offer. Thus, the parties at the first trial anticipated that Donner might invoke his attorney-client privilege in response to this line of questioning. The Judge permitted defense counsel to ask whether Donner knew from any source how much time he would have faced if he had not become a cooperator — a background question that, at least arguably, would not have invaded the privilege. (See, e.g., United States v O’Malley, 786 F2d 786, 794 [7th Cir 1986]; McCormick, Evidence § 93 [2d ed 1972]; 8 Wigmore, Evidence § 2327 [McNaughton rev ed 1961]; cf., People v Glenn, 52 NY2d 880, 881 [1981] [error for prosecutor to ask defendant who was asserting a justification defense, "not only as to whether he had conferred with his attorney about the case but as well as to the subject matter of their conversation, viz. the law of self-defense”].) Donner replied that he did not know from any source what his punishment could have been. Donner’s emphatic (if incredible) denial enabled the first Judge to avoid the thorny question that now faces me — namely, whether Donner’s attorney-client privilege can be invaded.
I cannot avoid the question because Donner did not reply to the same question in the same way at the trial of the third-tier defendants. Instead of "No, I did not know from any source what my punishment could be,” he said, "It was discussed between my lawyer and I. It’s lawyer client privilege” (minutes, Nov. 14, at 1293). We are now in the position that counsel anticipated in the first trial; since Donner has asserted his privilege and declined to specify what he knew, defendants cannot make their point that Donner had a motive to falsify his testimony.
Defendant Hunte, joined by his codefendants, has moved to compel Donner to answer the question about how much time he faced, regardless of the source of his knowledge. Defendant Robinson, joined by defendant Hunte (but not defendant Dowling), has moved to strike Donner’s entire direct testimony if the invocation of his attorney-client privilege prevents questioning on this subject. They urge that Donner be ordered to respond to questions about what he knew, even if the source of the information was his lawyer. They also argue that Donner has waived his privilege by taking the stand as a cooperating witness.
OPINION
The attorney-client privilege is codified in CPLR 4503, which provides that a client shall not be compelled to disclose *470 a confidential communication made between client and attorney. (See also, Fisch, New York Evidence § 518.) The privilege protects both client communications to their attorneys and communications from the attorney to the client which include legal advice or reflect information provided by the client in confidence. (Rossi v Blue Cross & Blue Shield of Greater N. Y., 73 NY2d 588, 592 [1989].) Here, Bonner’s knowledge about the jail time he faced if he did not enter into a cooperation agreement came from discussions with counsel regarding the advisability of his pleading guilty and becoming a cooperator. Thus, Bonner learned whatever he knows in a confidential communication protected by the attorney-client privilege.
A. Has Bonner Waived His Privilege?
Befendants’ contention that Bonner waived his attorney-client privilege by becoming a cooperator was rejected long ago by our Court of Appeals in People v Lynch (23 NY2d 262, 271 [1968]), where the Court said, "[Testimony about an event, even when the witness is protected by immunity, should not be construed as a waiver of the privilege, merely because the subject matter of the testimony may also have been discussed in the privileged communication.”
Bonner also did not waive his privilege at the entry of either of his pleas. Although Bonner told the presiding Judge at his arraignments that he had discussed his plea with his attorney, he was not asked any specific question about the contents of that conversation.
Finally, Bonner did not waive his privilege during his testimony at the 1994 trial. Clearly, he did not do so deliberately; the transcript is replete with references to Bonner’s assertion of his privilege. Nor did he do so by inadvertence. The clearest statement of the issues to be addressed in deciding whether the attorney-client privilege has been waived inadvertently is still found in Hearn v Rhay (68 FRB 574, 581 [EB Wash 1975]), where the court identified three components of an inadvertent waiver of privilege: first, the situation that results in assertion of the privilege is the result of some affirmative act by the asserting party; second, through this affirmative act, the party asserting the privilege puts the protected information at issue by making it relevant to the case; and third, application of the privilege would deny the opposing party access to information that is vital to its case.
Applying these rules to Bonner’s testimony at the last trial, there was no inadvertent waiver. It cannot be said that a wit *471 ness who was testifying under compulsion, pursuant to a cooperation agreement, did something affirmative to put the protected information (i.e., his knowledge, gleaned from his lawyer, of the magnitude of his possible punishment) in issue. This is not a case where a plaintiff puts the advice of counsel in issue by bringing a lawsuit (see, Meyerhofer v Empire Fire & Mar. Ins. Co., 497 F2d 1190, 1194-1195 [2d Cir 1974]; Bennett v Oot & Assocs., 162 Misc 2d 160, 162 [Sup Ct, Tompkins County 1994]), or where a defendant asserts an advice of counsel defense but refuses to reveal what counsel’s advice was. (See, Orco Bank v Proteinas Del Pacifico, 179 AD2d 390 [1st Dept 1992]; Securities & Exch. Commn. v Forma, 117 FED 516, 523 [SD NY 1987].) In such cases, the issue of what the lawyer said is clearly injected into the proceeding by the affirmative act of the person who is asserting the privilege. Thus, the familiar rule that one cannot use the privilege as a shield while relying on the advice of counsel as a sword governs. But to say that a compelled witness (even one who came under compulsion by voluntarily signing a plea agreement) injects the issue of his attorney’s advice into a proceeding simply by taking the stand makes no sense.
B. Is Donner’s Privilege Overridden by Some Compelling Public Policy Consideration?
Although the attorney-client privilege is accorded great deference by courts (though perhaps not quite so great as formerly), it is not absolute. Unlike the privilege against self-incrimination, it is not of constitutional dimension. It can, therefore, give way before a truly compelling consideration of public policy. (See, People v Mitchell, 58 NY2d 368, 373 [1983]; Matter of Priest v Hennessy, 51 NY2d 62, 68 [1980].) As the Court of Appeals has observed: "[T]he attorney-client privilege (CPLE 4503), like all privileges, operates as an exception to the general requirement that all persons give testimony upon facts within their personal knowledge inquired of in a court of law. [Citations omitted.] As such an exception, and notwithstanding its desirable purpose, the attorney-client privilege constitutes an 'obstacle’ to the truth-finding process, the invocation of which should be cautiously observed to ensure that its application is consistent with its purpose.” (Matter of Jacqueline F., 47 NY2d 215, 218-219 [1979].) Thus, in Jacqueline F., the Court of Appeals decided that any claim of attorney-client privilege must give way where the privilege was being asserted in order to frustrate the enforcement of a court judgment in a child *472 custody case. Similarly, in People v Anderson (NYLJ, Sept. 29, 1989, at 24, col 2 [Sup Ct, Bronx County, Bamberger, J.]), the court, while finding that certain statements between complainant and her therapist were protected by the social worker-client privilege, nonetheless ordered disclosure because the material "would be important to the preparation of the defense case on the issue of the witness’ reliability.” (See generally, Davis v Alaska, 415 US 308, 315-316 [1974] [Sixth Amendment right of confrontation requires that a defendant be allowed to impeach a witness regarding a confidential juvenile delinquency adjudication].)
That a criminal defendant’s constitutional right to confront witnesses against him trumps that witness’s assertion of a privilege is a proposition beyond dispute. (United States v Cardillo, 316 F2d 606, 613 [2d Cir 1963]; People v Chin, 67 NY2d 22 [1986].) The defendant’s right to confront prosecution witnesses about matters critical to his defense is absolute under our jurisprudence. Indeed, when the constitutional privilege against self-incrimination and the constitutional right of confrontation collide, the trial court, while respecting the witness’s assertion of the Fifth Amendment, must strike all relevant portions of the direct testimony of the witness who cannot be confronted. (United States v Cardillo, 316 F2d, at 613; People v Chin, 67 NY2d, at 28-29.)
The Sixth Amendment right of these defendants will be impaired if they cannot question Donner about his conversations with his attorney concerning the penalties he was facing. The matter about which Donner has asserted privilege is not collateral to the defense in this proceeding. The line between collateral and noncollateral matters is not always easy to draw, but in general, matters touching on motive, interest or bias, as well as matters that address the facts of the particular case or that tend to develop an alternative defense theory, are not collateral. The term "collateral” refers to matters that address a witness’s general credibility. A witness’s motive to falsify is never collateral. (Fisch, New York Evidence § 469 ["Because inquiries relating to a motive to falsify are not collateral, the examiner is not concluded by the answer of the witness * * * [who] may be contradicted by extrinsic evidence”]; see also, People v Chin, 67 NY2d, at 28, 31, supra; People v Green, 156 AD2d 465 [2d Dept 1989] ["(T)o deny a defendant an opportunity to contradict answers given by a previous witness to show bias, interest, or hostility may deny the defendant’s right to confrontation”].)
*473 Defendants seek to confront Donner about whether he knew that he faced up to 25 years in State prison if he did not sign a cooperation agreement. If he says "yes”, they can argue to the jury that Donner made up a story that implicated others in order to save himself from a long prison term. Since Donner was allegedly a coconspirator with these defendants in the corrupt enterprise, the answers that would be forthcoming in the absence of any privilege might also establish his untruthfulness with respect to the events of the crimes charged against Hunte, Robinson and Dowling. Thus, there would be a substantial risk of prejudice to the defendants if they were not permitted to elicit this testimony from Donner. If the invocation of privilege stands, Donner’s direct testimony will have to be stricken in its entirety, because his motive to falsify goes to the entire testimony and not just to some discrete portion of it.
The testimony need not be stricken, however, if Donner can be compelled to give up his privilege and testify. Obviously, that step cannot be ordered absent the most compelling reason. In the rare and infrequent case where assertion of an attorney-client privilege yields, it is overcome by other, more significant policy considerations. (Matter of Jacqueline F., supra.) As a general rule, where disclosure of an attorney-client communication is necessary in order to protect a significant right, and where the disclosure would not put the client in jeopardy of future prosecution, the privilege may give way to the overriding policy consideration that requires disclosure. Thus, in People v Radtke (155 Misc 2d 21, 24 [Sup Ct, Queens County 1992]), where the court refused to override the witness’s privilege, the court acknowledged that the accused’s right of confrontation would have been superior to the privilege "if it [had been] established that the information [would] be used to demonstrate bias, prejudice or some other ulterior motive on the part of the [victim].”
Applying the rule of Radtke (supra), the privilege can and should give way in this instance. Defendants’ right to cross-examine Donner about his knowledge of the penalties he faced, a noncollateral matter, is constitutionally guaranteed and clearly overrides the witness’s statutory right to assert the attorney-client privilege. Any invasion of his privilege will be extremely modest, going as it does to a discrete matter that has nothing to do with the crimes with which Donner was charged or for which he might have been charged. And compelling him to respond will not place him in jeopardy of future prosecution. The only possible basis for any future prosecution *474 would be perjury, but such jeopardy as Donner faced in that regard arose when he responded "Yes” to the question "Did you know from any source what penalties you faced if you did not enter into a plea agreement?” — a question he had answered "No” at the first trial. Compelling him to respond to the obvious follow-up question by revealing what the lawyer told Donner does not in any way enhance whatever jeopardy he may face as a result of his changing his previous testimony.[3]
If I could fashion some remedy that would protect both defendants’ rights and Donner’s privilege, I would do so. I conclude, however, that there is no such remedy. At the last trial (before the matter became irrelevant by virtue of Donner’s response to the general question permitted by the Judge), the court and parties discussed telling the jurors that they could consider Donner’s assertion of the attorney-client privilege in assessing his credibility, rather than forcing him to waive the privilege. That idea, however, runs squarely afoul of New York law, which provides that a witness’s assertion of the attorney-client privilege (or of any privilege recognized under our law) may not be held against him. (1 CJI[NY] 7.15; see, People v Thomas, 51 NY2d 466, 472 [1980]; People v Berg, 59 NY2d 294, 297 [1983].) Furthermore, allowing the jury to take Donner’s assertion of the privilege into account in assessing his general credibility does not afford an effective substitute for cross-examining him, since general credibility is a collateral matter that does not address, either directly or indirectly, the noncollateral subject of Donner’s motive to falsify his testimony.
Since the conditions for compelling a witness to reveal privileged information are met in this case, Donner’s privilege should be overridden. I order him to answer defendants’ very limited questions about his awareness of what penalties he faced in the absence of a plea agreement.

. This opinion explains a ruling that was delivered orally in court on November 15, 1995.

. Initially, Donner pleaded guilty to a single Martin Act violation. He violated his cooperation agreement almost immediately, and the District Attorney indicated that he would no longer afford Donner immunity. Several months later, Donner entered a second plea, to the Martin Act violation and two tax misdemeanors, and signed a second cooperation agreement.

. Notably, Donner did not invoke his privilege against self-incrimination regarding possible perjury charges. (Cf., People v Sapia, 41 NY2d 160, 164 [1976].)