87 N.Y.2d 536 (1995)
663 N.E.2d 872
640 N.Y.S.2d 831
The People of the State of New York, Respondent,
v.
Shannon Siegel, Appellant.
Court of Appeals of the State of New York.
Argued October 26, 1995
Decided December 27, 1995.
Dershowitz & Eiger, P. C., New York City (Nathan Z. Dershowitz and Amy Adelson of counsel), for appellant.
Denis Dillon, District Attorney of Nassau County, Mineola (Judith R. Sternberg and Peter A. Weinstein of counsel), for respondent.
Judges SIMONS, BELLACOSA and CIPARICK concur with Judge LEVINE; Judge SMITH concurs in result in a separate opinion in which Chief Judge KAYE and Judge TITONE concur.
*539 LEVINE, J.
Defendant Shannon Siegel was convicted, after a jury trial, of various felony and misdemeanor charges in connection with a life-threatening assault on an African-American teenager by a group of white young men.
The events that gave rise to defendant's conviction began at a large party in Atlantic Beach, Long Island, which defendant *540 attended with Gourdin Heller, a neighborhood friend, and four young men from Bayside, Queens  David Donahue, Gregory Kussoff, Ian Pearl and James Peralta. According to the People's proof, while at the party, defendant was accused of using a racial epithet to refer to Jermaine Ewell, who was dating a former girlfriend of defendant. A confrontation between Ewell and defendant erupted. Defendant then left the party with Heller, the young men from Bayside, and two young women. They were chased by a large group of Ewell's friends. Defendant spoke with Heller and then drove away with the two young women while Heller remained. The young men from Bayside left in another car and rendezvoused at defendant's house where they collected stickball bats and discussed what they should do in response to the incident at the party. Ultimately, they decided to drive back to the Atlantic Beach boardwalk in the vicinity of the site of the party.
By the time they returned, many of the young people who had attended the party had gathered on the boardwalk, including Ewell, who was talking to defendant's former girlfriend near the top of the boardwalk ramp.
According to prosecution witnesses, defendant approached Ewell from behind and hit him on the back of his head with a bat. As Ewell lay on the ground, he was repeatedly beaten with the bats and sticks, suffering multiple skull fractures. Two young white men, Anthony Franzese and Stephen Lieberman, attempted to intervene on Ewell's behalf but they were attacked with bats and sticks as well. Defendant and the other attackers then fled. Ewell was brought to a hospital where he underwent emergency surgery to remove a blood clot from his brain; though severely injured by the attack, he survived.
Defendant was charged in a nine-count indictment, along with codefendants Donahue, Kussoff, Pearl, and Peralta, with various offenses arising out of the attack, including attempted murder, assault in the first and second degrees, riot, conspiracy, racially motivated aggravated harassment, criminal possession of a weapon and misdemeanor violations of the Civil Rights Law. Eleven witnesses, including the complainants and Donahue, who had pleaded guilty to a misdemeanor riot charge, testified as to defendant's active role in the assault.
Defendant testified on his own behalf. He explained that he had been scared by the large threatening crowd that had chased him and that he returned to the boardwalk not to attack Ewell, but to locate Gourdin Heller who had told him, as they were being chased from the party, that if they became *541 separated defendant should meet him back at the boardwalk. According to defendant, he intended to use his bat only in a defensive manner in the event there was additional trouble, and that it was not he, but rather Peralta and his friends from Bayside who were motivated to "take care" of the crowd that had chased them from the party. Defendant further testified that when they arrived at the boardwalk Peralta and the others ran ahead of him and that when he joined the crowd on the ramp in search of Heller, the attack on Ewell had already begun.
Defendant was convicted of assault, first and second degrees, conspiracy in the fourth degree, riot in the second degree, and possession of a weapon in the fourth degree. The Appellate Division affirmed the judgment of conviction and sentence (207 AD2d 919). The Chief Judge of this Court granted defendant leave to appeal, and we now affirm.
On appeal to this Court, the primary issues relied upon by defendant in urging reversal relate to the trial court's treatment of the assertion by Gourdin Heller of his Fifth Amendment privilege against self-incrimination during his cross-examination as a defense witness.
Gourdin Heller was an important defense witness; his testimony on direct examination corroborated defendant's position that he did not return to the boardwalk with the intention of causing bodily harm to Ewell or others, but that he returned only to locate and, if need be, assist Heller. Thus, Heller testified that when events at the party escalated, defendant told him that if anything was to happen he would look for Heller later at the boardwalk. Heller also indicated that Ewell was the aggressor in his initial confrontation with defendant at the party.
On cross-examination, however, Heller's credibility became the focus of an immediate attack. In addition to revealing that portions of Heller's trial testimony as to collateral matters were inconsistent with prior statements he had made in connection with the case, the prosecutor also elicited testimony from Heller demonstrating a variance between his trial testimony and his prior Grand Jury testimony as to a material matter  whether the attack by defendant and his companions was racially motivated. At that point, the court expressed concern that Heller was in danger of committing the crime of first degree perjury and accordingly, over a defense objection and outside the presence of the jury, the court explained to Heller the potential legal consequences of such inconsistent *542 testimony and asked Heller if he would like to consult with counsel before continuing his cross-examination testimony. At Heller's request, an attorney was assigned to represent him and the court agreed to postpone the completion of cross-examination. At the next scheduled day of trial, Heller's counsel informed the court that Heller could testify further, but would refuse to answer certain questions concerning the incident and the subsequent investigation, and that as to those questions he would assert his Fifth Amendment privilege against self-incrimination. Again over defense objection, the court ruled that Heller would be questioned in front of the jury. Heller then returned to the witness stand, but in response to a question regarding his prior trial testimony, he asserted his Fifth Amendment privilege and refused to answer. After Heller refused to answer the next few specific questions, he indicated that he would continue to assert the privilege as to all interrogation regarding the events he had testified to on direct examination, and the court ordered the termination of further cross-examination.
Although the court had earlier informed the prosecution that it could move to strike all of Heller's testimony, no motion to strike was made. However, at the People's request, the court in instructing the jury explained that every witness has the right to invoke his or her Fifth Amendment privilege against self-incrimination, and then, over defendant's objection, charged: "[T]he mere fact that a witness invokes his right does not give rise to any inference. However, you may consider it on the issue of witness' credibility".
Defendant maintains that the trial court committed four separate errors in connection with Heller's testimony: first, that by warning Heller of the consequences of giving inconsistent sworn testimony and by advising him that he could consult with an attorney on this issue, the court improperly intimidated Heller into invoking the privilege; second, that the court erred in requiring Heller to invoke the privilege in the presence of the jury; third, that the court erred in instructing the jury it could consider a witness' refusal to testify on Fifth Amendment grounds on the issue of credibility; and fourth, that the court permitted the prosection to improperly comment on Heller's refusal to testify during his closing arguments.
We find no error committed by the trial court's treatment of Heller's testimony in any respect. Our precedents approve the conduct of a trial court in advising a witness, who it can be *543 reasonably anticipated will give self-incriminating testimony, of the possible legal consequences of giving such testimony and of the witness' Fifth Amendment privilege to refuse to testify (see, People v Lee, 58 N.Y.2d 773, 775; see also, People v Shapiro, 50 N.Y.2d 747, 761-762).
To be sure, there are limitations upon the exercise of that authority. Thus, a defense witness may not be singled out in advance of giving any testimony and threatened by the court with the punitive consequences of giving perjured testimony that the court will personally administer (see, Webb v Texas, 409 US 95, 97-98; People v Ramos, 63 AD2d 1009). Nor may the court repeatedly badger a witness into remaining silent or actively encourage a witness not to testify (see, United States v Arthur, 949 F.2d 211, 215-216 [6th Cir]). None of these abuses of a trial court's discretion to advise a witness of possible self-incrimination is present in the instant case. Heller was not deterred from testifying for the defense, since the trial court's intervention did not occur until after Heller had given all of his favorable direct testimony. Moreover, the court did not anticipate in advance the possibility of Heller incriminating himself on the witness stand. It was only after Heller was directly shown to have given opposing sworn testimony on the same facts at the trial and before the Grand Jury that the court interrupted his testimony on cross-examination to advise him of the possibility of prosecution for perjury as a result of his conflicting versions of the same events. The court did not advise Heller not to testify, but suspended further cross-examination until Heller had an opportunity to seek advice from an attorney the court assigned at his request.
The remaining objections to the treatment of Heller's assertion of his Fifth Amendment privilege turn essentially on the trial court's conclusion that Heller's refusal to answer questions on self-incrimination grounds could be considered by the jury in weighing his credibility. We hold that, in the circumstances of this case, the trial court was correct. Most certainly, Heller's direct testimony was favorable to defendant. Also beyond contest is that when Heller indicated he would continue to assert his privilege to remain silent as to all questions regarding the subject matter of his direct testimony and was then excused from the witness stand, the prosecution was effectively deprived of the right of cross-examination to test the truth of Heller's entire direct testimony. Under such circumstances, the prosecution was entitled to have Heller's direct testimony stricken in its entirety and the jury instructed to *544 disregard it (see, People v Chin, 67 N.Y.2d 22, 28; see also, Lawson v Murray, 837 F.2d 653, 655-656 [4th Cir] [defense witness' direct testimony stricken], cert denied 488 US 831).
The important precedents on this subject do not, however, regard striking all of the witness' testimony as the exclusive remedy when cross-examination has been thwarted by the assertion of the privilege against self-incrimination. On the contrary, striking the witness' entire testimony is considered the most drastic relief. As we held in Chin, the trial court has wide discretion in fashioning the appropriate corrective response, depending on the degree of prejudice that was incurred by the party whose right of cross-examination of the witness was impaired by the claim of the privilege (67 NY2d, at 29, supra).
In Chin, we recognized one of the alternative less drastic remedies when cross-examination has been blocked by the witness' exercise of the privilege against self-incrimination  striking only some but not all of the testimony (id., at 28). In the leading case of United States v Cardillo (316 F.2d 606 [2d Cir], cert denied 375 US 822, 887), the court posed three graduated levels of remedial action. The first is where the witness refused to testify on questions of matters "so closely related to the commission of the crime that the entire testimony of the witness should be stricken" (id., at 613). The second is where the refusal to answer was "connected solely with one phase of the case in which event a partial striking might suffice" (id.). The third and least drastic relief "would involve collateral matters or cumulative testimony concerning credibility which would not require a direction to strike and which could be handled (in a jury case) by the judge's charge if questions as to the weight to be ascribed to such testimony arose" (id. [emphasis supplied]).
McCormick agrees with the Cardillo analysis, stating that where the witness invokes the privilege on collateral matters such as relating to general credibility "[t]he trial judge can properly consider measures short of striking the witness's direct testimony, such as having the witness invoke the privilege before the jury or instructing the jury to consider the testimony in light of the defendant's reduced ability to cross-examine" (1 McCormick, Evidence § 140, at 526-527 [4th ed] [emphasis supplied]; see also, United States v Stephens, 492 F.2d 1367, 1374-1375 [6th Cir] [applying the three-level analysis], cert denied 419 US 852, 874; People v Holguin, 141 Mich App 268, 367 NW2d 846, 848 [same]). Less severe alternatives are particularly worthy of consideration when a defense witness *545 has invoked the privilege, in view of the defendant's Sixth Amendment right to present testimony (1 McCormick, op. cit., § 140, at 527 [4th ed]).
Since (as we have shown) the trial court would have been justified in striking all of Heller's direct testimony with instructions to the jury completely to disregard it, defendant is hardly in a position to complain of the less drastic remedy the court applied for the deprivation of the People's right of cross-examination, inviting the jury to consider its bearing on Heller's credibility. We note that the court properly charged the jury that his assertion of the privilege did not justify an inference on the merits of the case.
The trial court's choice of advising the jury that it could consider Heller's invocation of the privilege on his credibility, rather than striking his testimony, was not only consistent with proper concern for defendant's Sixth Amendment right to call witnesses on his own behalf, it was also fitted to the actual significance of Heller's action. By the assertion of his privilege to refuse to answer the prosecutor's questions, Heller's direct testimony was never subjected to the truth-testing process of cross-examination, and the jury was properly permitted to take this into account. This position is also consistent with other cases holding that a witness' obstruction of cross-examination is a factor for the jury to weigh on credibility (see, Delaware v Fensterer, 474 US 15, 21-22; Government of Virgin Is. v Riley, 754 F Supp 61, 65 [DVI]).
It follows from the foregoing that the jury had to be made aware that Heller claimed the privilege in response to questions on cross-examination, in order to assess its bearing on his credibility (see, People v Rocco, 170 AD2d 626, lv denied 77 N.Y.2d 1000; United States v Seifert, 648 F.2d 557, 560-561 [9th Cir]; 1 McCormick, Evidence § 140, at 526-527 [4th ed]). Thus, the limited interrogation of Heller on cross-examination when he invoked the privilege in the presence of the jury as permitted by the trial court, was proper. People v Thomas (51 N.Y.2d 466) and People v Vargas (86 N.Y.2d 215), relied upon by defendant on this issue, are inapposite. Heller was not called as a prosecution witness and his invocation of the Fifth Amendment privilege was not exploited, directly or indirectly, by the People in order to add substantive weight to the evidence of defendant's guilt. And the prosecutor in summation could properly refer to Heller's claim of the privilege in attacking *546 his credibility.[*] Thus, no errors were committed by the trial court in connection with Gourdin Heller's assertion of his Fifth Amendment privilege during cross-examination.
We have considered defendant's remaining assignments of error and find them either unpreserved or without merit.
Accordingly, the order of the Appellate Division should be affirmed.
SMITH, J. (concurring).
While I agree with the majority that reversal of defendant's conviction is not required, I write separately because I cannot agree that the trial court did not err in its treatment of Gourdin Heller's testimony "in any respect" (majority opn, at 542). Notwithstanding the errors below, given the overwhelming evidence of defendant's guilt, the trial court's errors were harmless and I would affirm the order of the Appellate Division.

I.
Defendant attended a "keg" party on June 1, 1991 with Gourdin Heller and several other friends from his neighborhood, at a house on Atlantic Beach, Long Island. The party was attended by as many as 250 young people, mostly of high school and college age. Jermaine Ewell also attended the party with several of his friends, as well as his girlfriend Nicole Diamond. Diamond had dated the defendant prior to dating Ewell.
At some point during the party, defendant conversed briefly with Nicole Diamond. The substance of their conversation is disputed. However, it was Diamond's understanding that defendant made a racial slight towards Ewell, who is African-American, and Diamond relayed that slight to Ewell. Ewell confronted defendant and defendant denied making any statement, racial or otherwise about Ewell. As a crowd began to form, heated comments were exchanged between friends of both defendant and Ewell, and ultimately the party broke up. As defendant and his friends left the party, they were chased by Ewell and his friends.
Defendant and his friends returned to their cars and, without Gourdin Heller, left the scene and met at a local gas station. The group discussed the events of the party and decided to return to the boardwalk near where the party had been located. *547 The group left the gas station, proceeded to defendant's house to get bats and sticks and went to the Atlantic Beach boardwalk.
Ewell was apparently attacked by defendant and his friends with the sticks and bats they obtained from defendant's house. Ewell was hit in the head with either a bat or a stick and rendered unconscious. He sustained severe injuries and head trauma. Several other young men at the beach, both friends of defendant, attempted to assist Ewell, but were similarly attacked by defendant and his friends and beaten. Defendant and his friends fled the scene.
Defendant was convicted, after a jury trial, of first degree assault, second degree assault, fourth degree conspiracy, second degree riot and fourth degree criminal possession of a weapon in connection with his participation in the incident on the beach. At trial, defendant's main witness, Gourdin Heller, corroborated defendant's version of the facts. Heller testified on direct examination that after the confrontation between defendant and Ewell, defendant and his friends left the party and walked towards their cars. Heller further testified that as defendant and his friends were at their cars, Ewell and his friends came within 50 yards of defendant and his friends, carrying bottles and holding their fists in the air. It was Heller's testimony that he and defendant agreed to meet at the boardwalk if they became separated. After defendant and defendant's friends went to their cars, Heller testified that Ewell and Ewell's friends chased defendant's car down the street. At no time, Heller testified, did he hear either defendant or any of his friends yell racial slurs at Ewell or his friends.
On cross-examination, the prosecution confronted Heller with Grand Jury testimony which contradicted Heller's testimony during direct examination. Heller alleged that he had been pressured when he gave Grand Jury testimony by the officer investigating the beach incident. Heller stated that because he was already on probation, the officer coerced him into making statements that were not true.
The trial court intervened and after a bench conference, called a recess. Outside of the jury's presence, the trial court advised Heller of the potential risks accompanying the commission of perjury, advised him of his right to counsel, and appointed *548 counsel to represent Heller.[1] After consulting with his client, Heller's counsel indicated to the court that Heller would invoke the Fifth Amendment privilege against self-incrimination as to any questions regarding the events of June 1, 1991.
Defense counsel argued that a break in the trial to allow Heller to consult with an attorney regarding his conflicting testimony, essentially "regroup", and then invoke his Fifth Amendment privilege regarding the events of June 1, 1991, would be too prejudicial to the defendant's case and that the court should not allow Heller to testify any further. In the alternative, defense counsel argued that it should have the opportunity to conduct a redirect examination of Heller for the purpose of inquiring about material other than the events of June 1, 1991. The People argued that they should be allowed to finish questioning Heller regardless of whether he invoked his Fifth Amendment privilege and that any prejudice that inured to defendant was his own making because defendant had called Heller as a witness.
On advice of counsel, Heller chose not to testify and asserted his Fifth Amendment privilege when questioned on cross-examination.[2] Over defendant's objection, the court instructed *549 the jury that an adverse inference could be drawn from Heller's invocation of his Fifth Amendment right against self-incrimination. Specifically, the court charged:
"You will recall that Gourdin Heller and Patrick Keon, while testifying, refused to answer questions upon the grounds that the answers might incriminate them. Our law provides that no person shall be compelled to be a witness against himself. That right is guaranteed to all persons and the mere fact that a witness invokes his right does not give rise to any inference. However, you may consider it on the issue of witness' credibility."
Also testifying for the prosecution were many of the young people present at the boardwalk on the night of June 1, 1991. Many of these witnesses were close friends of the defendant. Some witnesses knew Jermaine Ewell although they were not friends with him, and others did not know Jermaine Ewell.[3]

*550 II.
"[A] witness' refusal to testify on constitutional grounds does not, in and of itself, have any real probative significance, although it may have a disproportionate impact upon the minds of the jurors and may tend to create the impression that the witness is guilty of a particular crime" (People v Thomas, 51 N.Y.2d 466, 472). We have recognized that the trial court has a duty to intercede when there is a danger that a jury may draw an unwarranted inference against either the defendant or the People from a witness' refusal to testify. To combat this danger we have provided that:
"the trial court should, upon request, give the jurors a neutral instruction advising them that the witness has become unavailable for reasons beyond the defendant's control and that, consequently, no adverse inferences may be drawn from the witness' failure to appear" (Thomas, 51 NY2d, at 473-474, supra; see also, People v Berg 59 N.Y.2d 294).
Because a witness' decision to take the Fifth has no "real probative significance," neither the People nor the defendant should benefit from any unwarranted inferences that a jury might draw from it. Thus, Federal courts and other jurisdictions have held that jurors are not entitled to draw any inference from invocation of the privilege against self-incrimination, not even as to credibility (see, e.g., United States v Nunez, 668 F.2d 1116, 1123 [defendant's request for charge that jury could consider prosecution witness' refusal to testify as to the witness' credibility was properly denied, since it is inappropriate for the jury to draw any inference]; Bell v State, 614 So 2d 562, 564 [Fla] [court's denial of defense request for instruction that jury could draw adverse inference as to credibility from prosecution witness' invocation of Fifth Amendment was proper]).
Here it was the defense who called Heller. That, however, does not alter the fact that Heller's refusal to testify on Fifth Amendment grounds was not probative as to his credibility or otherwise. To be sure, whether a party deliberately called a witness knowing he or she would refuse to testify or whether a defendant's confrontation rights were infringed are factors relevant to whether the objectionable and unwarranted inferences arising from assertion of the privilege were prejudicial to the defense or the prosecution (see, People v Berg, 59 N.Y.2d 294, supra [courts must determine whether allowing prosecution to call witness solely to invoke privilege in presence of *551 jury outweighed possible prejudice to the defendant from the unwarranted inferences that may be drawn]). Regardless of who called the witness or whether a defendant's confrontation rights are implicated, the premise acknowledged in Thomas  that a witness' decision to refuse to testify on self-incrimination grounds has little probative significance  is controlling here. We have never held that a trial court may affirmatively charge the jury that a witness' invocation of the Fifth Amendment as to noncollateral matters may be considered for any purpose. Consequently, the trial court erred when it instructed the jury that Heller's invocation of the Fifth Amendment could be considered on the issue of Heller's credibility.
Moreover, Heller's refusal to testify did not merely go to the question of Heller's credibility as a witness or to collateral matters. Heller testified to the events of June 1, 1991 stating a chronology which favored the defendant and differed from other witness' recollections of the events. As the majority notes, Heller was an "important defense witness."
The majority's reliance on United States v Cardillo (316 F.2d 606, cert denied 375 US 822) in this regard is misplaced. In Cardillo, the Second Circuit explained that a jury instruction, as opposed to striking the direct testimony, is appropriate where the witness' answer would have related to collateral matters concerning credibility (compare, 1CJI[NY] 7.14, at 289 [where defense witness invokes privilege solely as to collateral matters, court should charge jury that "since the questions relate solely to his own credibility as a witness, you may take into consideration his refusal to answer such questions in determining, as you may with all witnesses, to what extent you believe his testimony and how much weight you wish to give his testimony"], with 1 CJI[NY] 7.14, at 291 [where defense witness invokes privilege as to noncollateral matters, jury should be instructed to draw no inference whatsoever or to speculate as to what the witness' answers might have been]).
Heller did not invoke the Fifth Amendment in response to a collateral matter, such as crimes or other bad acts which Heller may have committed and which would reflect badly on his credibility as a witness. Heller invoked the Fifth Amendment in response to the threat of perjury proceedings because of substantive differences between his trial testimony and Grand Jury testimony. The trial court's charge that the jury could draw a negative inference against Heller, because Heller exercised his privilege against self-incrimination, permitted *552 the jury to infer that Heller lied during direct examination and that the differing versions given by other witnesses was the truth. Despite the majority's conclusion to the contrary, the trial court's instruction negatively affected the defendant.
The majority notes that the trial court "properly charged" the jury not to draw any inferences on the merits of the case (majority opn, at 545). However, the charge is worded ambiguously. The jury was instructed that "the mere fact that a witness invokes his [Fifth Amendment] right does not give rise to any inference." In the next sentence, the jury is told, "However, you may consider it on the issue of witness' credibility." The trial court never explicitly instructed the jurors not to draw any inference on the merits of the case or against the defendant as a result of the Heller's exercise of the privilege against self-incrimination. Moreover, in the absence of a specific instruction not to draw any inferences, a jury may draw a negative inference against a defendant's credibility, especially in a case where the defendant has also refused to testify, because the jury has been permitted to draw a negative inference against other witness' refusals to testify. However, because the defendant did not invoke the Fifth Amendment here, and because of the overwhelming evidence of defendant's guilt, the trial court's error was harmless.
The majority contends that because the People were entitled to strike Heller's direct testimony, defendant should not be heard to complain about the court's charge, which it describes as a "less drastic remedy." The charge authorized the jury to make an inappropriate inference from Heller's assertion of his privilege not to testify. The erroneous nature of the court's instruction was not mitigated by the fact that Heller's direct testimony was allowed to stand.
The prosecutor's comments on Heller's invocation of the privilege against self-incrimination were also improper because a witness' exercise of the Fifth Amendment has no probative value and the defendant should not be penalized because a witness has exercised a constitutionally protected right. Moreover, pointed and repeated references to a witness' failure to testify may create a spillover effect and prejudice a defendant in a case where the defendant has also failed to testify. Defendant's right to remain free from any comments or inferences resulting from his invocation of the Fifth Amendment privilege against self-incrimination would be eroded as a result.
Order affirmed.
NOTES
[*] Moreover, defendant objected to only one of these references in the prosecutor's summation and the trial court sustained the objection and ordered the remark stricken.
[1] The colloquy between Heller and the court was as follows:

"Q: Mr. Heller, you've been asked a series of questions.
"A: Yes, I have.
"Q: And you are under oath now and you, of course, realize that?
"A: Yes.
"Q: And you were under oath before a Grand Jury when you testified?
"A: Yes.
"Q: There seems to the court to be a basic inconsistency in certain answers you gave under oath in the Grand Jury and under oath in this proceedings.
"A: Yes.
"Q: There is a crime called perjury.
"A: Right.
"Q: It is a felony and a very serious matter and I feel it is my obligation right now to advise you. Do you want a lawyer to represent you at this stage of the proceeding?
"A: I don't know. I don't know. I'm just here to tell the truth; you know what I mean? * * *
"Q: You realize that any thing you do say can be used against you; do you understand that?
"A: Yes, I do. * * *
"Q: Do you want to discuss this with an attorney.
"A: Yes, I'd like to."
[2] When questioned by counsel for the People, Heller responded as follows:

"Q: Mr. Heller, did you testify in your direct examination on Tuesday that you saw Shannon Siegel take a stickball bat out of his car at the party?
"A: On advise [sic] of counsel I refuse to answer that question on the grounds that it may incriminate me.
"Q: I asked if you saw Shannon Siegel take a bat out of the trunk of the car?
"A: On advise [sic] of counsel I refuse to answer that question on the grounds that it may incriminate me.
"Q: Mr. Heller, did you testify on your direct-examination that before Shannon Siegel drove away from the party, that he told you if anything happens, that you should meet him at the boardwalk?
"A: On the advise [sic] of counsel I refuse to answer that question on the grounds that it may incriminate me.
"Q: Did you testify on direct-examination that after Mr. Siegel drove away, you, Pat Keon and Dennis Tveter went to the west end of the boardwalk to the Sunny Atlantic Beach Club?
"A: On the advise [sic] of counsel I refuse to answer that question on the grounds that it may incriminate me.
"Q: Mr. Heller, do you intend to invoke your 5th Amendment privilege with respect to any question that is asked?
"A: Yes."
[3] Janine DeCandia and Jennifer Levy testified that although they knew both defendant and Ewell, they considered themselves good friends with the defendant. Andrew Schneider, who had known defendant since elementary school and had never laid eyes on Ewell before the night of the incident, also testified for the prosecution. Antonio Franzese, Stephen Lieberman and Daniel Ligorner all attended high school with the defendant and also considered themselves good friends with him, but testified for the prosecution that defendant was with the group of teens that attacked Ewell on the boardwalk.