OPINION OF THE COURT
 

 Ciparick, J.
 

 When the People question a witness knowing the witness will respond by invoking the Fifth Amendment, and then compound the prejudice to defendant by expressing in closing argument that the witness’s claim of the testimonial privilege was evidence of defendant’s guilt, defendant is deprived of a fair trial. Therefore, we hold that reversible error was committed in this case and defendant is entitled to a new trial.
 

 On April 9, 1987, Lourdes Caban was murdered in her car while it was parked on Avenue Z and West 15th Street in Brooklyn. School books found in the car led the police to Anthony Arlequín, a cousin of defendant. On April 10, 1987,
 
 *218
 
 the police detective assigned to the case located Arlequín at FDR High School in Borough Park, Brooklyn, where he was briefly questioned. Arlequín then accompanied the detective to the 60th Precinct. After several hours of questioning, Arlequín admitted that he was with Caban in her car hours before her death, and implicated defendant in the murder. Arlequín was then brought to the 84th Precinct where he repeated his statement to an Assistant District Attorney, who preserved the statement on audiotape. This statement, together with an incriminating remark defendant purportedly made to a friend and an eyewitness’s description of a beige Chevrolet Impala fleeing the crime scene, which the police found parked near defendant’s home after the murder, resulted in defendant’s arrest and indictment for murder in the second degree (Penal Law § 125.25 [1]) and criminal possession of a weapon in the second degree (Penal Law § 265.03). On the fourth day of defendant’s trial, Arlequín was called as a witness by the People. Outside the presence of the jury, Arlequín advised the court that he wanted an attorney because his April 10, 1987 statement was a lie. The court appointed counsel for Arlequín, and, after a recess, he proceeded to testify outside the presence of the jury, with his attorney by his side.
 

 In his testimony, Arlequín identified defendant as his first cousin, described the car defendant drove as a beige Chevrolet, stated that Caban called him requesting to see him on April 9, 1987 and that she picked him up from work that day in her car. Arlequin’s testimony is otherwise nonsubstantive, marked by the frequent assertion of his Fifth Amendment privilege in response to the questions posed by the prosecutor. Arlequín invoked his Fifth Amendment privilege in response to the prosecutor’s questions regarding his previous statement, including whether he remembered telling the detective on April 10, 1987 that defendant told him to tell the police he had not seen defendant for two years, to deny that he saw defendant on the night of the crime, and not relate that defendant told him he killed Caban because he promised himself he would kill her. Further, Arlequín declined on Fifth Amendment grounds to indicate whether he saw or spoke with defendant on the night of the murder; whether he had planned to meet Caban on the night she was murdered; whether he spoke with defendant after the murder; whether he saw Caban and defendant together on the night of the crime; and, whether he remembered if defendant was driving the beige Chevrolet on the night of the crime. At the conclusion of this testimony by
 
 *219
 
 Arlequín, the court advised counsel that if the People wished to call him as a witness, Arlequín could be questioned on those matters he answered but not on the matters for which he invoked the Fifth Amendment.
 

 Two days later, the People called Arlequín as a witness. After the prosecutor established Arlequin’s familial relationship with defendant and that he knew Caban as his cousin’s girlfriend, the majority of questions posed by the prosecutor concerned the same matters, in even greater detail, that the witness previously refused to answer outside the presence of the jury. Consequently, Arlequín asserted his testimonial privilege on the ground he would incriminate himself. At the conclusion of Arlequin’s testimony, defendant’s counsel requested that the jury be instructed that the witness has a constitutional right to assert the Fifth Amendment and no inference — favorable or not — should be drawn, and that Arlequin’s testimony be stricken. The court stated it would charge the jury with regard to the witness’s Fifth Amendment right but would not strike his testimony.
 

 During her summation, the prosecutor suggested that Arlequín "had a hand in [the crime],” that the evidence revealed a set-up on a lovers’ lane and "that’s why you saw what [he] did on the witness stand.” The prosecutor related that Arlequín drove Caban to the designated spot and then traded cars with defendant, who got out of his car and into Caban’s, leaving Arlequín free to whisk defendant away from the scene. The prosecutor portrayed a hurried getaway to explain the presence of Arlequin’s abandoned school books in Caban’s car. Referring to Arlequin’s conversation with the police the next day at his high school, the prosecutor pointed to his refusal to discuss this in court because "he knows more than he wants to say * * * he is covering for this defendant, for this defendant, his cousin. He knows what happened and he won’t tell us * * * we know from the evidence he was there * * * if somebody else killed a wife of his cousin[,] brutally executed her, why wouldn’t he say who it is * * * The only reason he is not telling us is because he is protecting [his cousin].” Defense counsel interposed objections during these comments, which the court overruled, stating that the jury may consider the evidence it has heard.
 

 The prosecutor continued in this vein, advising the jury that the inference to be drawn is that Arlequín knows his cousin killed Caban, and that is why he would not testify about the
 
 *220
 
 events of April 9, 1987. According to the prosecutor, Arlequín had a motive to lie based on his relationship with defendant, and did not "want to * * * pin [the murder] on his cousin.” The prosecutor urged the jury to look at Arlequin’s courtroom conduct, insisting "[h]e didn’t answer any of my questions. You saw he wasn’t cooperative with me. * * * [H]e is protecting his cousin.” The court again overruled defense counsel’s objection. The People now concede that these repeated summation references to Arlequin’s invocation of the Fifth Amendment were improper.
 

 At the conclusion of the summations, the court instructed the jury that a witness has a constitutional right to exercise the Fifth Amendment privilege by declining to answer questions on the ground that the answer may be incriminating to the witness, and that the jury should not speculate regarding what the witness’s answers may have been or consider the witness’s refusal to answer as favorable or unfavorable to either party. Defense counsel had requested a stronger charge, one directing the jury not to draw an unfavorable inference against defendant, which the trial court rejected. The court additionally instructed the jurors that they may consider and weigh Arlequin’s testimony but that they must strike those questions for which he invoked his constitutional right not to answer.
 

 The jury found defendant guilty of murder in the second degree and criminal possession of a weapon in the second degree. Defendant was sentenced to concurrent terms of 25 years to life on the murder count and 5 to 15 years on the weapons possession count. Defendant appealed, arguing that the prosecutor committed reversible error when she unfairly buttressed the People’s case by discrediting Arlequín based on his assertion of the Fifth Amendment and by using his assertion of the privilege in a manner that prejudiced defendant’s case. Noting that it was improper for the prosecutor to argue that Arlequín invoked his Fifth Amendment right in order to protect defendant, the Appellate Division nevertheless found this error harmless in the face of the court’s charge that the witness’s refusal to answer on the ground he may incriminate himself could not be considered in assessing defendant’s guilt
 
 (see, People v Vargas,
 
 199 AD2d 291). Thus, the Appellate Division affirmed the judgment
 
 (see, id,.).
 
 A Judge of this Court granted leave, and we now reverse.
 

 
 *221
 
 The Fifth Amendment of the US Constitution commands that no person shall be compelled in any criminal case to be a witness against himself. Where, as here, a witness asserts his Fifth Amendment privilege in the presence of the jury, the effect of the powerful but improper inference of what the witness might have said absent the claim of privilege can neither be quantified nor tested by cross-examination, imperiling the defendant’s right to a fair trial
 
 (see, People v Pollock,
 
 21 NY2d 206, 212;
 
 United States v Maloney,
 
 262 F2d 535, 537-538;
 
 Namet v United States,
 
 373 US 179,185-186).
 

 We have recognized that when the prosecution deliberately calls a witness solely to elicit a claim of privilege, calling that witness constitutes prejudicial error, mandating reversal
 
 (see, People v Pollock,
 
 21 NY2d 206, 212-213,
 
 supra; see also, People v Berg,
 
 59 NY2d 294, 298-299). The Supreme Court has ruled that a witness’s invocation of the Fifth Amendment privilege may amount to reversible error in two instances: one, when the prosecution attempts to build its case on inferences drawn from the witness’s assertion of the privilege, and two, when the inferences unfairly prejudice defendant by adding "critical weight” to the prosecution’s case in a form not subject to cross-examination
 
 (see, Namet v United States,
 
 373 US, at 186-187,
 
 supra; see also, United States v Maloney,
 
 262 F2d 535,
 
 supra).
 
 In
 
 Namet,
 
 the Supreme Court concluded that the witnesses’ claims of testimonial privilege were "at most cumulative support for an inference already well established by the nonprivileged portion of the [witnesses’] testimony”
 
 (Namet v United States,
 
 373 US, at 189,
 
 supra).
 
 The Supreme Court stated that the witnesses’ own testimony regarding the illegal gambling operation and their association with Namet created a "natural and completely permissible inference” that Namet’s visits to the witnesses’ business premises concerned the illegal gambling activities
 
 (see, id.,
 
 at 189). Further, the Supreme Court reasoned that the effect of the witnesses’ assertion of the Fifth Amendment was minimized by their "lengthy nonprivileged testimony,” defense counsel’s failure to object to the prosecution’s line of questioning, and the fact that the Government did not capitalize on the witnesses’ invocation of the Fifth Amendment
 
 (see, id.,
 
 at 189).
 

 Namet
 
 established the framework for courts to evaluate a challenge by a defendant regarding the prosecution’s handling of the testimony of a witness who pleads the Fifth
 
 *222
 
 Amendment at trial.
 
 [1]
 
 Essentially, this entails a determination of whether the probative value of the testimony of the witness who invoked the Fifth Amendment privilege in the presence of the jury outweighs any prejudice to the defendant. Important considerations which factor into this analysis include the prosecutor’s conduct and intent in calling the witness, the number of questions asked, their significance to the State’s case, whether the prosecutor draws any inference in closing arguments from the witness’s assertion of the privilege and refusal to answer, the witness’s relationship to defendant, and the jury instructions
 
 (see, People v Berg,
 
 59 NY2d, at 298,
 
 supra; People v Pollock,
 
 21 NY2d, at 212-213,
 
 supra).
 

 [2]
 

 Applying these factors to the instant case compels the conclusion that the prejudicial effect of Arlequin’s testimony to defendant outweighed the negligible relevant information he provided, and that no curative instruction could temper the impression created by his repeated invocation of the Fifth Amendment in response to the prosecutor’s pointed questions. Only days before Arlequín was called to testify, the prosecutor received a clear indication of what he would not discuss based on his fear of self-incrimination. Moreover, the court directed the prosecutor upon conclusion of the nonjury appearance that she not question him on those matters for which he invoked the privilege "unless there [was] some compelling reason for it.” Nevertheless, during her questioning of Arlequín, the prosecutor posed many of the same questions she knew he would decline to answer, at times elaborating on details she did not even raise when he was questioned outside the presence of the jury, notwithstanding defense counsel’s objections.
 

 Implicit in the prosecutor’s numerous closing argument references to Arlequin’s assertion of his Fifth Amendment privilege is the impermissible inference that Arlequín refused
 
 *223
 
 to answer to avoid identifying his cousin as Caban’s murderer. The witness’s nonresponsive testimony was critical to the prosecution’s case as demonstrated by the prosecutor’s portrayal, during her summation, of Arlequin’s desire to protect his cousin by not revealing the scope of his involvement and knowledge of the events of April 9, 1987. Without question, this witness’s refusal to answer and invocation of his Fifth Amendment privilege 48 times before the jury, can readily be construed as the chief source of the inference that this witness knew defendant committed the crime based on his own connection to the crime scene and his relationship with defendant
 
 (see, Namet v United States,
 
 373 US, at 189,
 
 supra).
 
 It was impossible for defendant to dispel this inference on cross-examination nor was the court’s instruction capable of mitigating the damaging impact of the incriminating questions. As noted,
 
 supra,
 
 the People have conceded that the closing argument references to Arlequin’s testimonial privilege were improper.
 

 Given the conceded absence of any direct evidence linking defendant to the murder, the tendency to draw the unfavorable inference against defendant is irresistible. In this circumstance, the witness’s nonresponsive testimony invited the inference of defendant’s guilt, negating the Appellate Division’s conclusion, and the People’s argument on this appeal, that the limiting instruction given in the court’s charge rendered any prejudice harmless. Defendant was irreparably prejudiced when the prosecutor purposely called a witness knowing full well that the witness would invoke the Fifth Amendment and then seized on the witness’s silence in summation to bolster the People’s case against defendant
 
 (see, People v Russ,
 
 79 NY2d 173, 178;
 
 People v Roberts,
 
 70 NY2d 682, 683;
 
 People v Brosnan,
 
 32 NY2d 254, 262).
 

 The People cannot justify the approach employed in this case on the ground that defendant might have been entitled to a missing witness charge if Arlequín did not testify. The People contend that Arlequín was the only person who knew where Caban was in the hours immediately preceding her death, and could provide a narrative of the events before and after the murder. Arlequin’s testimony added the "critical weight” to the prosecution’s case in a form not subject to cross-examination by defendant, which is recognized as the hallmark of reversible error
 
 (see, Namet v United States,
 
 373 US, at 187,
 
 supra; United States v Maloney,
 
 262 F2d, at 536-537,
 
 supra; see also, People v Pollock,
 
 21 NY2d, at 213,
 
 supra).
 
 
 *224
 
 Indeed, given the prosecutor’s awareness of Arlequin’s intention to invoke the Fifth Amendment, her repeated violations of the trial court’s order not to question him on such matters and her summation references to his invocations of his Fifth Amendment right constituted an attempt to build the People’s case on the improper inferences that could be drawn from his use of the testimonial privilege
 
 (see, United States v Maloney,
 
 262 F2d, at 537,
 
 supra; cf., People v Berg,
 
 59 NY2d, at 299,
 
 supra).
 
 This denied defendant a fair trial, and he is therefore entitled to a new trial. In view of this, we need not reach defendant’s remaining contentions.
 

 Accordingly, the order of the Appellate Division should be reversed, and a new trial ordered.
 

 Chief Judge Kaye and Judges Simons, Titone, Bellacosa and Smith concur; Judge Levine taking no part.
 

 Order reversed, etc.
 

 [1]
 

 .
 
 Douglas v Alabama
 
 (380 US 415, 419-420) made the
 
 Namet
 
 rubric applicable to the States.
 

 [2]
 

 .
 
 See also, Douglas v Alabama
 
 (380 US 415, 419-420,
 
 supra
 
 [prosecutor’s conduct; curative jury instruction; witness’s invocation of Fifth Amendment may implicate defendant’s Sixth Amendment right to confront adverse witness]);
 
 Namet v United States
 
 (373 US, at 184,
 
 supra
 
 [number of questions asked]);
 
 United States v Coppola
 
 (479 F2d 1153, 1160 [improper reference in closing argument]);
 
 United States v Vandetti
 
 (623 F2d 1144, 1145 [relationship between defendant and witness claiming privilege]);
 
 Bowles v United States
 
 (439 F2d 536,
 
 cert denied
 
 401 US 995 [jury instructed not to rely on any inferences it may draw from witness’s reliance on Fifth Amendment]);
 
 Rodo v State of Connecticut
 
 (607 F2d 572, 581,
 
 cert denied
 
 447 US 920).