[637 NYS2d 874]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LYNN
DE JAC, Appellant.

Fourth Department, February 2, 1996

### APPEARANCES OF COUNSEL

*Kevin Bauer,* Buffalo, for appellant.

*Kevin M. Dillon, District Attorney* of Erie County, Buffalo, for respondent.

### OPINION OF THE COURT

WESLEY, J.

Defendant appeals from a judgment of conviction of murder in the second degree (Penal Law § 125.25 [2]). On appeal, defendant raises several questions, principally, whether the verdict is against the weight of the evidence and whether the evidence is legally sufficient to support her conviction.

I

The following facts are undisputed, unless otherwise indicated. On the evening of February 13, 1993, defendant attended a wedding with her boyfriend, Dennis Donohue. They returned to defendant's home at approximately 11:00 P.M. and began to argue. When defendant called 911 at 11:44 P.M. to report "an unwelcome guest", Donohue left the house. Defendant had been drinking alcohol heavily and using cocaine. Shortly after Donohue left, defendant allegedly strangled her 13-year-old daughter, Crystal, in Crystal's bedroom. The police responded to the 911 call at 11:58 P.M., knocking on the front and back doors. The officers testified that no one answered, although they heard a dog barking. The officers left. Defendant then went to the nearby Babcock Grill.

While there, at about 12:10 or 12:15 A.M. on February 14, defendant called her former boyfriend, Keith Cramer, at his place of work. She explained to Cramer that she and Donohue had

an argument, and that, if Donohue came near her, she would act as though she were talking to Crystal. She told Cramer that Crystal loved him. Then defendant started acting as though she were talking to Crystal, and apologizing to her. Defendant ended that conversation, but called Cramer back at about 12:45 or 1:00 A.M. During the second conversation, her moods alternated, from "talking to [Cramer] like she would when she had been drinking," to crying. When Cramer suggested that she go home, defendant responded, "I can't go home. I can never go home. All I want to do is sit here and drink."

At about 2:30 A.M., Michael Nichter, a friend of defendant, arrived at the Babcock Grill. He struck up a conversation with defendant at the bar that continued until Donohue arrived about 20 minutes later. Defendant and Donohue again argued. Defendant then left the Babcock Grill with Nichter. Donohue went out to the parking lot, engaged in an altercation with Nichter, then followed Nichter's car until Nichter displayed a handgun. At about 4:00 A.M., when defendant and Nichter arrived at Nichter's home, Donohue was waiting; another altercation ensued. Donohue asked defendant to tell him what she wanted. Defendant said "something to the effect yes, I want you to go. Leave me alone, and stay away from my kids." Donohue then "went on his way."

Nichter and defendant went inside Nichter's home, where defendant used the phone. She called the bartender at the Babcock Grill, and asked him to go check on Crystal. She then called Crystal's friend Shannon Mediak, and asked her to check on Crystal, "because she felt that her psychopathic boyfriend Dennis was in the house and [Crystal] was in danger". Before Shannon could respond to the request, her mother, Christine Kornacki, arrived home and took the phone from Shannon. Kornacki asked defendant why she did not check on her daughter herself; defendant was "sobbing and gasping". Kornacki said she would check on Crystal. She called defendant's home and got no answer. She then called defendant and tried to calm her by saying that she had checked the house and the television was on. Defendant responded that Crystal never fell asleep in front of the television. Kornacki indicated that she had called the house and got no answer. Defendant said that she could not understand why Crystal did not answer the phone because defendant had put the phone beside Crystal's bed. Kornacki again suggested that defendant check on Crystal herself; defendant said she would do so.

Defendant then had Nichter take her to her home. While Nichter sat on the living room couch, defendant went into one of the bedrooms. Nichter heard defendant speaking, and heard mumbling, but did not pay attention to the content. Defendant put the telephone and the dog in the bedroom, shut the door, and asked Nichter if he wanted to stay. When Nichter declined, they returned to Nichter's house, where defendant spent the rest of the night.

Nichter dropped defendant off at her house between 12:30 and 1:00 P.M. At 1:00 P.M., Crystal's friend, Katherine Harrington, arrived at the house. Defendant came out the rear door and told Harrington, "You can't come in right now. You can't come over. You have to leave." Defendant seemed upset and "a little shaky", but "she wasn't really crying."

At about 1:30 P.M. or 1:45 P.M., Nichter heard a message from defendant on his answering machine. Defendant was crying and asking him to pick up the phone. Nichter did not pick up the phone or call her back because he assumed that she was calling about another altercation with her boyfriend.

At about 2:00 P.M., defendant called Keith Cramer. Defendant was crying, and told Cramer that she thought Crystal was dead. Cramer rushed over to defendant's house. When he touched Crystal's body, it was stiff and cold. As he called 911, defendant started howling in the background. The police responded, and took defendant and Cramer to headquarters for statements. Defendant told the police that Donohue had said something about her children while she, Nichter and Donohue were at Nichter's house; Nichter testified at trial that Donohue never mentioned defendant's children. Cramer testified at trial that, as he was driving defendant home, defendant said, "I think that they're going to pin this on me". When Cramer told defendant that he thought she had killed Crystal, defendant did not respond.

Either that evening or the next, Cramer, Kornacki and several other people were at defendant's home. Kornacki stated to defendant that the autopsy would show the time of Crystal's death, and "we'll all be set free." Defendant got very upset and called 911 to have the police remove Kornacki from the premises.

Three months later, defendant allegedly admitted to a family friend, Wayne Hudson, that she had choked Crystal, causing her death. According to Hudson, defendant further told him that she had been drinking heavily and had been using cocaine before the murder. In addition, defendant indicated to

Hudson that she had not answered the door when the police arrived in response to her 911 call even though her dog was barking loudly. The Medical Examiner concluded that Crystal died between 11:25 P.M. on February 13, 1993 and 5:25 A.M. on February 14, 1993.

## II

■ The contention that the evidence is legally insufficient to support defendant's conviction has not been preserved by a motion to dismiss " 'specifically directed' " at the alleged defects in the proof *(People v Gray,* 86 NY2d 10, 19, quoting *People v Cona,* 49 NY2d 26, 33, n 2). Were we to exercise our power to review that contention as a matter of discretion in the interest of justice *(see,* CPL 470.15 [6] [a]), we would nevertheless affirm. The evidence, viewed in the light most favorable to the People, could lead a rational trier of fact to conclude that the elements of the crime had been proven beyond a reasonable doubt *(see, People v Cabey,* 85 NY2d 417, 420-421). Wayne Hudson testified that defendant admitted to him that she had choked her daughter to death. The proof concerning defendant's actions on the night of the murder and the following day evidences a consciousness of guilt and a failed attempt to blame the murder on defendant's boyfriend, Donohue.

## III

■ Defendant contends that the verdict is against the weight of the evidence because, *inter alia,* Hudson had a motive to lie; he was cooperating with the prosecutor in the hope of receiving preferential treatment for his pending, unrelated criminal matters. Determination of the credibility of witnesses is a task within the province of the jury, and its judgment should not be lightly disturbed *(People v Gruttola,* 43 NY2d 116, 122; *see also, People v Bell,* 190 AD2d 1032, *lv denied* 81 NY2d 881). We reject defendant's contention that Hudson's testimony was incredible as a matter of law *(see, People v Walker,* 155 AD2d 916, 917, *lv denied* 75 NY2d 819).

## IV

■■■ We do not find that " 'there is a grave risk that an innocent [person] has been convicted' " *(People v Carter,* 63 NY2d 530, 536, quoting *People v Kidd,* 76 AD2d 665, 668, *lv dismissed* 51 NY2d 882), and we decline to reverse the conviction as a matter of discretion in the interest of justice *(see,* CPL 470.15 [3] [c]). Defendant's right of confrontation was not

violated when County Court restricted defendant's cross-examination of Hudson regarding the acts underlying the forgery charges pending against him; the court was aware that Hudson would invoke his Fifth Amendment rights *(see, People v Green,* 170 AD2d 1024, 1025, *lv denied* 78 NY2d 966; *see generally, People v Vargas,* 86 NY2d 215). The court did not err in denying defendant's motion to set aside the verdict on the ground of newly discovered evidence *(see,* CPL 330.30 [3]). The claimed new evidence as presented was hearsay, and could only be used to impeach the credibility of Donohue *(see, People v Burnette,* 117 AD2d 987, 988). We do not consider defendant's continued claims of innocence to be a basis for determining that the sentence is unduly harsh or severe.

## V

Accordingly, the judgment of conviction should be affirmed.

DENMAN, P. J., LAWTON, BALIO and DAVIS, JJ., concur.

Judgment unanimously affirmed.