People v Graham (2021 NY Slip Op 07068)





People v Graham


2021 NY Slip Op 07068


Decided on December 16, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: December 16, 2021
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Angela M. Mazzarelli Peter H. Moulton Lizbeth González Bahaati E. Pitt


Index No. 856/12 Appeal No. 14317 Case No. 2016-2326 

[*1]The People of The State of New York, Respondent,
v
Eugene Graham, Defendant-Appellant.



Judgment of the Supreme Court, Bronx County (Ralph Fabrizio, J. at alibi notice proceedings; Troy K. Webber, J. at jury trial and sentencing), rendered August 6, 2015, convicting appellant of murder in the second degree and criminal possession of a weapon in the second degree, and imposing sentence.




Caprice R. Jenerson, Office of the Appellate Defender, New York (Margaret E. Knight of counsel), and Holwell, Shuster & Goldberg LLP, New York (Timothy W. Grinsell of counsel), for appellant.
Darcel D. Clark, District Attorney, Bronx (Robert Myers, Marianne Stracquadanio and Rafael Curbelo of counsel), for respondent.



MOULTON, J. 


In this appeal from a murder conviction, we are confronted with the unusual situation where defense counsel admitted his own ineffectiveness in failing to properly investigate and prepare this murder case for trial. Notably, counsel stated to the motion court that he filed a late alibi notice due to his incompetence and his putative belief that the statutory deadlines would not be enforced; his personal problems (which, while serious, did not account for his years of inactivity on this case); and his trial schedule. Yet, after setting forth his own ineffectiveness, counsel declined to withdraw from representation, essentially arguing that his expertise as a trial lawyer trumped his missteps. Thus, not surprisingly, defendant argues on appeal that he was denied the assistance of effective and conflict-free counsel.
Despite defense counsel's conduct the conviction should be affirmed. Defendant has not demonstrated that based on the totality of circumstances he was deprived of meaningful representation and a fair trial. Defendant has also failed to show that he was deprived of his right to conflict-free counsel. Assuming the existence of a conflict, defendant has not demonstrated, as he is required to do, that his defense was affected by the operation of that conflict. Defendant's remaining arguments for reversal are without merit.
Relevant Facts
Defense counsel was assigned to represent defendant in February 2012. He did not meet with defendant until March 31, 2014 — over two years after defendant's arrest. In 2014, defense counsel admitted to the motion court that he only had "two video conferences with [defendant]. One of them being a few months ago and finding out more about the case. That was not competent" (emphasis added). Defense counsel made no attempt to argue that his lack of investigation was attributable to a reasonable trial strategy. He did explain that he did not hire investigators, as he found them to be ineffectual. Instead, he relied on his practice of asking his clients "[a] few weeks before trial" to "tell [him] everything that went on."
Furthermore, although defendant's postarrest statement indicated that he had been home at the time of the shooting, defense counsel did not interview potential alibi witnesses until nearly three years later, which was nearly six months after defendant told him of his [*2]alibi and after the motion court adjourned the case so that counsel could vet the defense with the witnesses before they took the stand. Moreover, it was only at trial that defense counsel asked to review the information stored on defendant's phone obtained by the police when they arrested him. It is not clear whether or whendefense counsel searched for additional witnesses who may have had knowledge of the shooting.
By decision dated March 6, 2014, the motion court concluded that the delay in serving the alibi notice was attributable to the "willful conduct on the part of defendant and his family members" who waited nearly 2 ½ years to inform counsel of the defense. Nevertheless, given the motion court's concerns about counsel's invocation of his own ineffectiveness, it accepted defendant's late alibi defense to "preserve the overall integrity" of the case.
The motion court was so troubled by defense counsel's statements about his ineffectiveness that it conducted a Gomberg hearing to inquire whether defendant wanted to speak with another lawyer about a potential conflict arising from his counsel's self-proclaimed failures (see People v Gomberg, 38 NY2d 307 [1975]). The motion court also considered replacing counsel. The People were similarly concerned and sought counsel's removal, but later withdrew that application.
At the Gomberg hearing and at prior court appearances, defense counsel argued that it was in his client's interest to keep him if the court permitted the late alibi defense. Defense counsel represented that he had contacted the Disciplinary Committee (now the Attorney Grievance Committee) to inquire whether he was required to withdraw as counsel. According to counsel, he was advised that if defendant's alibi defense was precluded, he would have "problems ethically." However, if the court allowed the defense, no problem would exist.[FN1] He explained that if the late alibi was permitted his client should continue with his representation because he had a "reputation that's impeccable as a trial attorney" in practice for 25 to 30 years, was in "Forbes Magazine" and "represented many, many famous people, and the New York Mets." After asserting that he was "humble," he stressed that his "expertise is trial work." According to counsel, "being off my game is twenty times better than any other 18B lawyer." He also characterized the motion court's concern regarding his effectiveness as "aggravation," something which he had "never been put through" given his stellar reputation.
Ignoring defense counsel's bluster at the Gomberg hearing, the court properly focused on defendant's response. Defendant declined the court's offer to consult with another attorney regarding the possibility of a conflict stating, "No, I am all right." Defendant had also commented earlier in the hearing that "I am satisfied with him being my lawyer. I would request [that] he continues to be my lawyer" because "[e]verybody is entitled to a bad part of time in their [*3]life. The man [is] saying he had a bad time and all with the family. Family comes before anything most important of all." Although the motion court ultimately decided not to replace counsel, it took the unusual but prudent step of appointing cocounsel who appeared for defendant on the first day of jury selection.
Trial Testimony
Mayda Arriola and Kevin Alston testified for the People. Arriola testified that on the night of February 4, 2012, she was in her 10th floor apartment with her boyfriend Joseph Patterson, Kevin Alston, and the victim Elijah Green. Arriola testified that after her friends left at approximately 4:00 a.m., she heard someone turning the doorknob to her apartment door. She went to the door, but she saw no one. She explained that a short time later she received a call from Patterson to open her door for Alston and Green. She opened the door, but again did not see anyone. She testified that a short time later she heard something like a "bomb" and two to three minutes later heard the lobby door slam. She testified that she went to her window and upon seeing defendant and Salim Wilson walking in the courtyard, she called 911. She described calling Patterson to ask if he had been able to reach Alston or Green. According to Arriola, Patterson could not reach them.
Kevin Alston testified that he was a drug dealer who sold drugs with Green and Patterson, who was his cousin. He testified that he and Green sold drugs at McKinley Houses where defendant and Wilson also sold drugs. According to Alston at some point before Green was killed, defendant and Wilson told Alston and Green to stop selling drugs at that location. Alston testified that about two to three days later Wilson fired four to six shots at Alston which he did not report. Alston also testified that about one month later defendant and Wilson punched him. Alston testified that he discontinued selling drugs at McKinley Houses but Green continued to sell drugs there.
Alston testified that on the night of the shooting he was with Patterson, Green and Arriola at her apartment. He testified that he and Green left the apartment between 4:30 a.m. and 4:45 a.m. According to Alston, he and Green were in the lobby when they saw defendant and Wilson exit a cab and come towards the building. They ran back into the building to hide. Alston explained that because he did not have Arriola's number, he called Patterson to call Arriola to open her door. However, when Alston and Green returned to Arriola's apartment, her door was locked. Alston testified that he and Green then ran to the roof and when he looked down, he saw defendant and Wilson. Alston saw defendant point to them. According to Alston, he called Patterson again to ask Arriola to let them in. However, Alston and Green discovered that her door was still locked. Alston testified that after trying to get into Arriola's apartment they tried to go to his girlfriend's 13th floor apartment via the staircase. Alston testified that as [*4]the two began to walk upstairs, he heard the doorknob to the 14th floor stairway shaking. Green opened the door to the 14th floor, commenting that defendant and Wilson were after Alston, and not Green. Alston testified that after he ran down the steps to the floor below, he heard defendant from above ask, "Where he's at?" and Green's response, "I don't know," as well as laughter from Wilson. Alston testified that he then looked around the corner and saw defendant pull something out of his waistband, which Alston believed was a gun. According to Alston, he "creeped" down the stairs and about five to six seconds later heard a shot and ran out of the building.
The responding officer, investigating detective, and the medical examiner testified that Green's body was found on the 14th floor stairwell landing. The cause of death was multiple gunshots to the body.
Defendant presented three alibi witnesses: his mother, his stepfather, and a relative named Doreen Jiminez. Defendant's mother testified that when she returned home around midnight, she checked on her children and saw defendant in his bedroom, apparently sleeping. She testified that she, her husband, and Jiminez played cards in the kitchen, which was across from defendant's bedroom, into the early morning. Defendant's mother testified that she woke defendant early in the morning for work, as she usually did. Defendant's father confirmed that his wife stated that defendant was asleep in his room, that the three of them played cards until the early morning, and that his wife woke defendant in the morning. Jiminez testified that they played cards until 2:00 a.m. but she clarified that after playing cards they talked until the early morning hours. According to all three witnesses, defendant never left his bedroom until his mother woke him in the morning and they heard no noises or voices coming from the bedroom.
Among other witnesses, the People presented a former AT&T employee, who testified that for the date of February 4, 2012, the phone ending with the number 1601, which was registered to defendant's mother, sent or received 61 text messages between 12 a.m. and 5:09 a.m. and made or received 29 voice messages between 12 a.m. and 5:15 a.m. The employee also testified that the same phone number sent or received 178 text messages between 7:30 a.m. and 1 p.m. On summation, the People pointed out that these messages occurred at a time when defendant was supposed to be asleep or at work. The People also argued that defendant's mother's testimony, in which she had stated that the family shared eight interchangeable cells phones, was not credible. A family with five children and two adults, the People argued, would not remember (or ask their friends to remember) eight different cell phone numbers. Rather, the People asserted that defendant's mother took this position to disassociate her son from the phone number ending in 1601.
The People also played for the jury a February 17, 2012 recorded inmate [*5]phone call; Alston identified defendant's voice on the call. The People argued that defendant's mother was the other voice on the call, which the jury could recognize because she had previously testified. In the call, the voice identified as defendant's stated, "[N]obody was there so how could she identify me like that." On summation, the People pointed out that the only way that defendant would know that "nobody was there" was if defendant was there himself.
A jury convicted defendant of murder in the second degree and criminal possession of a weapon in the second degree. Defendant was sentenced to 20 years to life imprisonment for the murder conviction. He also received a concurrent sentence of 10 years' imprisonment, and 5 years of post-release supervision for the criminal possession conviction.
Discussion
Ineffective assistance of counsel claims under New York's constitution are governed by the standard of meaningful representation articulated in People v Baldi (54 NY2d 137 [1981]). "So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met" (id. at 147). Our Baldi jurisprudence "offers greater protection than the federal test" (People v Caban, 5 NY3d 143, 156 [2005]) because a defendant "need not fully satisfy the prejudice test of Strickland" (People v Stultz, 2 NY3d 277, 284 [2004]). Nevertheless, we "regard a defendant's showing of prejudice as a significant but not indispensible element in assessing meaningful representation" as "[o]ur focus is on the fairness of the proceedings as a whole" (id.). Thus, unlike the federal standard, under New York law "even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of a fair trial" (Caban, 5 NY3d at 156).
Defendant has not demonstrated that under the totality of the circumstances he was deprived of meaningful representation or a fair trial. Defense counsel took steps to ensure a fair trial for his client by moving for a suppression hearing in 2012 regarding defendant's post-arrest statement, objecting to the People's Molineaux/Sandoval application, and raising a Batson challenge. Contrary to defendant's argument, defense counsel and cocounsel effectively represented defendant at trial. At trial, defense counsel competently cross-examined Alston and Arriola, attacked Alston's testimony on summation and twice moved for a mistrial based on Alston's testimony. Cocounsel successfully moved for preclusion of the admission of cell site and tower records for the phone ending with the number 1601. Defense counsel also filed a CPL 330 motion.
Moreover, defendant has not shown how defense counsel's performance deprived him of a fair trial. Defense counsel's self-proclaimed failures to properly investigate and prepare [*6]this murder case for trial are disturbing. Nevertheless, defendant has not shown that counsel's lapses deprived him of any useful information or negatively impacted his ability to mount a defense. Defendant only speculates that a proper investigation and trial preparation might have yielded something helpful to the defense, but he does not suggest what that exculpatory information might be (compare People v Oliveras, 21 NY3d 339, 348 [2013] [where the defendant confessed to murder, the defense counsel's failure to investigate and review the defendant's psychiatric records constituted ineffective assistance of counsel because the records related to whether the confession was voluntary]).
Moreover, defendant was not denied the right to conflict-free counsel. "An ineffective assistance of counsel claim also may be premised on a conflict of interest" (People v Berroa, 99 NY2d 134, 139 [2002]). Both concepts protect the right to meaningful representation, but a claim premised on a conflict of interest also assures that counsel is "conflict-free and singlemindedly devoted to the client's best interests" (id. [citation omitted]). That "right is impaired when, absent a defendant's informed consent, defense counsel represents interests which are actually or potentially in conflict with those of the defendant" (id. [citation omitted]). Some conflicts are deemed to be so serious that they cannot be waived (see People v Watson, 26 NY3d 620, 626 [2016]).
"[S]imultaneous or successive representations [are] usually associated with conflict of interest analysis" (Berroa, 99 NY2d at 139). In Berroa, however, a conflict analysis was applied where the defense counsel violated disciplinary rules prohibiting a lawyer from becoming an adverse witness by stipulating to facts that contradicted the defense witnesses' statements (id. at 139-140). Notably, "not every violation of an ethical rule will constitute ineffective assistance of counsel [but] when a lawyer is called to testify against the client's interest the conflict is obvious" (id. at 140).
Unlike ineffective assistance of counsel claims, which are analyzed under the Baldi standard, a conflict claim merits reversal if the conflict "bears a substantial relation to the conduct of the defense" (People v McDonald, 68 NY2d 1, 9 [1986] [internal quotations omitted]). Said another way, a defendant "must demonstrate that the conduct of his defense was in fact affected by the operation of the conflict of interest" (People v Alicea, 61 NY2d 23, 31 [1983]).
Defendant concedes that the conflict here is "not typical" as it is "derived from and centered on [defense counsel's] ineffectiveness." Assuming the existence of an independent conflict that would support an ineffective assistance claim, defendant's argument still lacks merit. Defendant argues that the conflict occurred when his counsel refused to withdraw from representation for personal reasons, despite conceding that he did not effectively investigate the case [*7]and prepare for trial. However, defendant cannot "demonstrate that the conduct of his defense was in fact affected by the operation of the conflict of interest" (Alicea, 61 NY2d at 31). After defense counsel declined to withdraw and defendant noted that he wished to proceed with counsel, the motion court appointed cocounsel to assist the defense (see People v Konstantinides, 14 NY3d 1, 6-7, 11-12 [2009] [the defense was not affected by operation of the conflict where the defendant was represented at trial by an attorney who was potentially conflicted for attempting to bribe and threaten a potential witness because the defendant was also represented by a second attorney at trial who was conflict-free]). Moreover, the defense was not affected by operation of the conflict because after defense counsel declined to withdraw, defense counsel and cocounsel effectively represented defendant at trial.
Defendant's remaining arguments are not persuasive. At trial, Alston's invocations of his Fifth Amendment privilege with respect to his drug-selling activities did not deprive defendant of his right of confrontation. Such matters were "collateral to the direct examination" or "cumulative matter already presented" (People v Chin, 67 NY2d 22, 28, 29 [1986]; see also United States v Cardillo, 316 F2d 606, 611 [2d Cir 1963], cert denied 375 US 822 [1963]). Furthermore, the invocation of the privilege did not add "critical weight to the prosecution's case" (People v Vargas, 86 NY2d 215, 221 [1995] [citation omitted]). In any event, any prejudice arising from Alston's silence was mitigated by the court's instruction that the jury may consider his refusal to answer for its bearing on his credibility (see People v Siegel, 87 NY2d 536, 543, 545 [1995]). There was no selective invocation of the privilege, because Alston's direct testimony regarding the existence of his pending drug charges, and a brief remark on cross-examination, did not waive his Fifth Amendment rights regarding his drug activity (see Klein v Harris, 667 F2d 284, 287-288 [2d Cir 1981]).
There was nothing in the challenged portions of the prosecutor's summation that was so egregious as to require reversal (see People v Overlee, 236 AD2d 133, 141 [1st Dept 1997], lv denied 91 NY2d 976 [1998]; People v D'Alessandro, 184 AD2d 114, 118-119 [1st Dept 1992], lv denied 81 NY2d 884 [1993]). The remarks at issue were generally fair comments on the evidence, made in response to defense counsel's summation, and the court's curative actions were sufficient to prevent any prejudice.
The trial court properly denied defendant's application made under Batson v Kentucky (476 US 79 [1986]). Defendant did not produce statistical or nonstatistical "evidence sufficient to permit the trial judge to draw an inference that discrimination ha[d] occurred" (Johnson v California, 545 US 162, 170 [2005]), and thus failed to make a prima facie showing of unlawful discrimination in the People's exercise of challenges. Defendant's [*8]argument that, in making this ruling, the trial court failed to follow the Batson protocols is unpreserved (see People v Richardson, 100 NY2d 847, 853 [2003]), and we decline to review it in the interest of justice. As an alternative holding, we find it unavailing.
We perceive no basis for reducing the sentence.
Accordingly, the judgment of the Supreme Court, Bronx County (Ralph Fabrizio, J. at alibi notice proceedings; Troy K. Webber, J. at jury trial and sentencing), rendered August 6, 2015, convicting defendant of murder in the second degree and criminal possession of a weapon in the second degree, and sentencing him to an aggregate term of 20 years to life, should be affirmed.
Judgment, Supreme Court, Bronx County (Ralph Fabrizio, J. at alibi notice proceedings; Troy K. Webber, J. at jury trial and sentencing), rendered August 6, 2015, affirmed.
Opinion by Moulton, J. All concur.
Manzanet-Daniels, J.P., Mazzarelli, Moulton, González, Pitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: December 16, 2021



Footnotes

Footnote 1: Presumably the advice that counsel received was based on Rule 1.7 of the Rules of Professional Conduct (22 NYCRR 1200) which prohibits, among other things, what is known as a personal interest conflict of interest. Rule 1.7 (a) (2) provides in relevant part that "a lawyer shall not represent a client if a reasonable lawyer would conclude that . . . there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests." When "the [personal interest] conflict is so stark that a belief in the possibility of competent and diligent representation would not be reasonable . . . then the lawyer would generally be required to withdraw from the representation" (NY St Bar Assn Comm on Prof Ethics Op 1048 at ¶ 23 [2015]).